Walter Patterson, Plaintiff-Appellee, v. Peabody Coal
Company, Defendant-Appellant.

Term No. 54-M-3.

Opinion filed October 1, 1954.
Released for publication October 19, 1954.

DeWitt Twente, of Harrisburg, for appellant.

Rumsey & Dennis, of Harrisburg, for appellee.

Mr. Justice Bardens delivered the opinion of the court.

This case presents the perplexing problems involved in a claim for damages based upon an alleged private nuisance. Since the factual situation is necessary to an understanding of principles involved we will state it in some detail.

Suit was filed June 16, 1951. Plaintiff's land is the surface of the northwest quarter of the southeast quarter of section 27, township 8 south, range 5 east of the third principal meridian, except a railroad right of way of 100 feet running diagonally through the premises. The ownership of coal had been separated from that of the surface in 1905 and 1906. On the property plaintiff owns a dwelling house, barn and other small outbuildings. He has lived there since 1912 and acquired a deed to it in 1929.

Defendant owns a coal mine, earlier known as "Harco" Mine, and now as Peabody Mine No. 47 situated about ¼ mile southwest of plaintiff's land. Defendant began operating a coal washer in 1937 and a coal drier in February 1949. The mine itself was closed in April 1951 but the washer and drier continued to operate, coal being brought in from other mines of defendant.

During the five years preceding the filing of suit, plaintiff, his wife and his daughter lived upon his land. It was used generally for farming purposes. The land was not of the best for farming and plaintiff had permitted the improvements to deteriorate. In fact none of them had ever been painted by him. There was a cistern at a corner of the porch and a walled-up stream or shallow well about 150 feet north of the house.

Plaintiff complained of gas, smoke and fumes that came from burning gob piles and dust from the stack of the coal drier. Defendant's witnesses explained that the washer removes impurities known as "gob" from the coal, which material is trucked to the gob pile. They testified to the care used by defendant in piling and featheredging gob in the proper manner so as to eliminate spontaneous combustion as far as possible and the efforts put forth to extinguish fires in the piles when they occurred. In the washing process the heavier materials sink to the bottom and lighter materials, consisting of fine coal or slurry, float on top and are carried through a pipe to a settling pond where the water drains off. It is then trucked to the drier, conducted into a Luver conveyor which pulls the wet material up to the top and through the drier stack. In the course of being conveyed the hot air and gases from the furnace push through the coal, drying it. During this process coal dust is raised through the stack and carried into the air.

Plaintiff and his witnesses (including his wife and daughter) testified that the gas, fumes or smoke from the gob piles had blown over his premises since 1946; that before erection of the drier the dust was not too bad, but that since 1949, when the drier began operation, soot and dust have come over on him, carried by the prevailing southwest winds, for hours and days at a time; that the land gets black, the fields and crops get black and so does a person working in the fields or garden; that dust gets inside the house, in food and bed clothing; garden stuff sometimes is not fit to eat; it affected his nostrils and throat; sometimes on hot summer nights it was necessary to sleep with windows closed; you couldn't keep the house clean; in drying laundry at times it got covered with black soot; water in the cistern (which drains from the roof) was not fit to drink; any water or milk left in open pails or buckets would get soot on it.

Defendant's testimony proved that the neighborhood was a mining community. At one time 1,000 miners worked there and about 75 houses were erected and occupied. Grocery and other stores, restaurants, picture theaters, poolrooms, a bank, churches and school were present and used. Defendant's witnesses also detailed the operations of the washer and drier and proved that the methods used in treating the coal were the approved ones in the industry and met the recognized standards.

Defendant did not deny that dust comes out of the drier stack in abundance at various times. The drier is operated six days a week and 24 hours a day.

Plaintiff's complaint was bottomed on loss of value of comforts and conveniences only. He alleged defendant had a duty to protect him against said grievances and it failed to do so and that plaintiff was free from contributory negligence. Defendant's answer denied all allegations. The jury awarded plaintiff damages in

the sum of $5,000 and judgment was entered on the verdict.

Defendant contends that the lower court should have directed a verdict because (1) the case was based and tried on a negligence theory and there is no evidence of negligence of defendant or (2) if plaintiff's suit is considered based on a nuisance theory, there is no evidence sufficient to sustain recovery for nuisance. In the alternative defendant contends it is entitled to a new trial for error in instructions and in rulings on evidence and for improper argument and conduct of counsel and for excessive damages.

■ It would serve no useful purpose for us to review the authorities on the subject of nuisance. These were thoroughly examined by this court and the Supreme Court in the case of *Gardner v. International Shoe Co.,* 319 Ill. App. 416, 49 N.E.2d 328, and 386 Ill. 418, 54 N.E.2d 482. The Supreme Court in its opinion pointed out the lack of unanimity in the cases and our research leads us to the same conclusion. In view of the changing conditions in the state and nation this result was inevitable. The earliest cases proceeded upon the theory that an owner of property was entitled to pure and unadulterated air over his property. As we became more industrial and less pioneering and agricultural, courts were forced to recognize that industry could never develop or even live if exceptions were not made in the original hard and fast rule. The law thus developed that if industrial plants were located in places suitable to their business no action for nuisance would lie unless the interference with use of land was substantial and unreasonable or unless the defendant was causing more interference than was necessary in the proper conduct of his business. This latter alternative is commonly classified as negligence. Vol. 39 Am. Jur., Nuisances, paragraphs 44 and 53; Vol. 66, C. J. S., Nuisances, paragraph 23.

■■■■■ We have found no better treatise or guide on the subject of private nuisances than that contained in the Restatement of the Law on Torts, chapter 40, paragraphs 822 to 831 inclusive. Paragraph 822 states the general rule and outlines the elements necessary for recovery. Two of these elements are: (1) the invasion must be substantial and (2) the invasion must be either (a) intentional and unreasonable or (b) actionable under rules governing liability for negligence. "Intentional" is further defined in paragraph 825 as including a knowledge that the invasion of another's interest in use and enjoyment of land is resulting or is substantially certain to result. "Unreasonable" is explained in paragraphs 826 to 831 inclusive and in general involves weighing the gravity of the harm done to plaintiff against the utility of the business of the defendant plus the suitability of location of defendant's business. Whether the defendant's invasion of plaintiff's rights is substantial and unreasonable is usually a fact question and becomes a law question only under rules governing directed verdicts. Am. Jur., Nuisances, paragraph 54; C. J. S., Nuisances, paragraph 23. The above rules were fully recognized in the *Gardner* case. Both the Appellate and Supreme Courts' opinions considered the extent of the invasion and the reasonableness or unreasonableness of it together with suitability of the location of defendant's business. Both courts recognized that that case dealt with odors and not with anything of a physical nature deposited on the land; both recognized the invasion was not unreasonable in extent nor in the unsuitability of location of defendant's business. The Supreme Court, on page 429, states the principle of nuisance as follows:

"The principle to be derived from these authorities is that the unlimited and undisturbed enjoyment which one is entitled to have of his own property must be

qualified to this extent, that trifling inconveniences resulting from the useful employment of a neighbor's property must be submitted to when what is complained of arises from and is suitable to the locality and when the employment of one's premises under the circumstances is reasonable."

■ Turning now to the case at bar we think it is distinguishable from the *Gardner* case on the question of the substantiality of the invasion. Here we have a physical substance deposited on plaintiff's premises in quantity and with frequency. On the other hand we have no doubt of the suitability of the location of defendant's business. It is in a mining community and the refining of the product is necessary to market it. Nor do we have any question of the utility and importance to the public of coal mining and processing. The deposit of dust on plaintiff's premises however seems to be in sufficient quantity, as well as duration, to justify a submission of the case to a jury.

■ The instant case is further complicated because of the claim for damages from fumes, gases and odors from the burning of gob piles. This type of invasion cannot be classified as "intentional" because it is not certain to occur. It is caused by spontaneous combustion and the evidence showed defendant did all in its power to prevent it and to extinguish fire when it started. Nor is it substantial. Even the plaintiff admitted the conditions were not so bad until the drier started. The plaintiff failed to prove any lack of care on behalf of defendant in its occurrence. Therefore this type of invasion is controlled by the *Gardner* case.

■■ The jury having been permitted to consider damages from fumes, gases and odors in arriving at their verdict, it follows that the case must be reversed and remanded to permit consideration separately of the proof on the issue of damages from the deposit of dust on plaintiff's premises. Because of this conclusion

317

we need not consider the error urged by defendant with respect to argument and remarks by plaintiff's counsel. In passing, however, it should be reiterated that references to opposing counsel in a fashion tending to prejudice the jury have no part in a law suit.

██ Defendant complains of an instruction on plaintiff's behalf using the word "nuisance" and points out that the word has an entirely technical meaning in law different from its use and understanding to the average layman. We agree with defendant. In the introductory note to chapter 40, Restatement of the Law of Torts, it is pointed out that "nuisance" is a term used in several senses and that the use of the word is avoided even in a discussion directed to the legal profession. In 39 Am. Jur., Nuisances, paragraph 2, it is stated:

"It has been said that the term 'nuisance' is incapable of an exact and exhaustive definition which will fit all cases, because the controlling facts are seldom alike and each case stands on its own footing."

Use of the word in instructions to juries should be avoided.

For reasons indicated this cause is reversed and remanded to the trial court for a new trial.

*Reversed and remanded.*

CULBERTSON, P. J. and SCHEINEMAN, J., concur.