WILLIAM PASULKA *et al.*, Plaintiffs-Appellants, v. FRANK N. KOOB, Indiv. and as Trustee, *et al.*, Defendants-Appellees.

Third District   No. 3—87—0335

Opinion filed June 9, 1988.

LUND, J., dissenting.

Barclay, Damisch & Sinson, Ltd., of Chicago (Thomas J. Swabowski, of counsel), for appellants.

Myers, Daugherity, Berry & O'Conor, Ltd., of Ottawa (Eugene P. Daugherity and Andrew J. O'Conor, of counsel), for appellees.

JUSTICE SPITZ delivered the opinion of the court:

This is an appeal from a directed verdict entered in the circuit court of La Salle County. At the close of plaintiff's evidence, the verdict was directed in favor of defendants Frank N. Koob, individually and as trustee under a declaration of trust dated August 18, 1978, and the Western Sand and Gravel Company (Western), an Illinois corporation. The plaintiffs, William and Marcia Pasulka, in an 11-count amended complaint, sought money damages and injunctive relief stemming from: (1) plaintiffs' purchase of a parcel of land from Koob at which time they obtained a right of first refusal to purchase "adjacent" land Koob owned and over which "adjacent" land they were advised certain restrictions applied; and (2) the subsequent sale by Koob to Western of an option to purchase another parcel of land which Koob owned at the time of the original sale to plaintiffs and from which Western is mining sand and gravel. The evidence presented at trial is hereafter set out in chronological order.

In 1974, Koob owned 320 acres in sections 2, 3, 10, and 11 in Dimmick Township, La Salle County, Illinois. North 35th Road ran over and along the boundary between sections 2 and 11 and continued over and along the boundary between sections 3 and 10. In addition, the Little Vermilion River coursed over the property in sections 10 and 11. In that year, he entered into an agreement to sell 80 acres, being the east one-half of the northwest one-quarter of section 11, to Bernard and Loretta Cohn. By this agreement, the Cohns would undertake to subdivide the 80 acres and pay the $86,000 purchase price

from the proceeds of subsequent sales of lots. This property became known as the Timber Lane Estates, a residential area with covenants filed of record, including the prohibition of commercial enterprise, business, profession or home occupations.

Between June 1977 and November 1979, individually and later as a trustee under a declaration of trust dated August 22, 1978, Koob sold four additional parcels: 3.448 acres in section 3 to Craig and Shawn Lamp; 3.515 acres in sections 2 and 3 to Donald and Anita Albert; 1.770 acres plus a driveway in section 2 to Kenneth and Elizabeth McCaleb; and 2.228 acres in section 2 to Janet Delaney. In each of these sales, the sales agreement restricted the subsequent use of the subject property, and Koob retained a right of first refusal in the event the land was later sold by the purchasers. The restrictions were to run with the land, binding all those who would take from sellers or purchasers. The Lamps also negotiated a right of first refusal in an additional 1.071 acres of section 3 legally described in their agreement with Koob. A similar right of first refusal to an additional tract was stricken from the Alberts' agreement with Koob. In the agreement with Delaney, Koob's right of first refusal was restricted to Koob, personally, and did not pass to his heirs, assigns, executors and devisees. The agreements, restrictions and the plat of survey of these tracts were not filed of record in the recorder of deeds office of La Salle County.

In the fall of 1978, the plaintiffs began to search for a prospective homesite. They were looking for a permanent investment and a homesite located near nature, woodlands, farms, and educational systems for their four children and in a quiet atmosphere. They also wanted an opportunity in the future to purchase additional land.

In July 1980, Koob answered a newspaper advertisement plaintiffs had placed. On July 27, 1980, plaintiffs and Koob had an extensive discussion. In that conversation, Koob informed the plaintiffs about how beautiful his land was and about the wildlife that lived there. He advised them that his remaining 229 acres contained a pond, a creek, a large number of trees and wildlife. At that time, there were four homes in the area. The rest was used for farming. Koob stated he had developed Timber Lane Estates and wanted to preserve the rest of his land for all the people who were buying from him. He also stated he had purchased the 80 acres of land on the north side of North 35th Road because it was a junkyard and he wanted to clean it up and transform it into a beautiful area.

Koob talked about the ways in which his land was restricted. He said he had an obligation to restrict all of his land and all he would

ever do with his land was sell fine residential homesites and continue grain farming. He also stated he was developing a fine residential area along North 35th Road and had a way of protecting people's investments without the bother and trouble of a formal subdivision.

Koob told plaintiffs he did not want anyone "messing up" his land and indicated he would enforce the restrictions. In particular, he advised the plaintiffs he did not want them to build an untraditional house that would devalue the neighborhood. Nor would he approve of their family business, which involved the assembly and distribution of residential water purifiers, if it had employees or customers entering on the land. He wanted to discuss with Craig Lamps the delivery of equipment to plaintiffs by a semitractor-trailer three or four times a year, although Koob saw no problem with it. He asked Lamps in plaintiffs' presence if that was all right. Koob pointed out an abandoned gravel pit on his land but said it would never be reopened. The pit had last been used between 1965 and 1967. He said he hated quarries because they permanently destroyed land and would never sell to a quarry. In discussing with Koob other homesites plaintiffs were looking at, Mrs. Pasulka expressed her concern about living near a silica plant near Mendota, and Koob discouraged her from choosing a homesite near a pig farm. Plaintiffs asked Koob if he would be willing to sell them an additional parcel of land to the south. Koob replied he would, but not at that time. When plaintiffs inspected the property, plaintiffs could see the tips of the old mine spoils in section 10, south of the river, but plaintiffs did not go across the river to look at the pit.

Koob showed plaintiffs a survey of seven tracts of real estate. The plaintiffs ultimately decided to purchase tract 2, a 4.287-acre parcel located in section 10, at a price of $25,500. A proposed agreement was drafted by Koob's attorney which was subsequently modified at the request of plaintiffs, who were represented by counsel. In the modified agreement, paragraph 9, in part, provided plaintiffs with a right of first refusal as to "adjacent property owned by the Seller." In addition, a paragraph was added to the page of restrictions on the property which states: "The Purchasers are assured that these restrictions shall be included in the sale by the Seller of any adjacent property owned by him." The sale was consummated on November 7, 1980.

At the time of plaintiffs' purchase, the neighborhood was quiet, peaceful, and beautiful with much wildlife. It was basically a farming community with 27 homes, including those in Timber Lane Estates. The closest industrial facility was Manley Sand Company, three miles

away, and Troy Grove Quarry, 2¾ miles away. The road was in good condition with normally light traffic.

In August 1983, Dimmick Township placed an ad in the La Salle News Tribune seeking to purchase a one-acre site for use as a heavy equipment storage building. Koob answered the ad and said he was willing to sell tracts 1 or 3 illustrated on the seven-parcel plat he had previously shown plaintiffs. Tracts 1 and 3 are contiguous to tract 2, purchased by plaintiffs, on the west and east, respectively.

Shortly thereafter, Koob mentioned to plaintiffs that the township was interested in purchasing land. Mrs. Pasulka replied that their agreement prohibited Koob from selling the land to the township because of the plaintiffs' right of first refusal and the restrictions. Koob disagreed, claiming the parcel which Dimmick Township wanted to buy was not "adjacent" and, therefore, not subject to the agreement. Approximately two weeks later, Koob telephoned plaintiffs and admitted their interpretation of the contract was correct.

On September 6, 1983, the plaintiffs wrote a letter to Koob seeking to purchase tracts 1 and 3. Thereafter, on November 16, 1983, the plaintiffs recorded at the office of the La Salle County recorder of deeds a "Memorandum" unilaterally executed by plaintiffs which stated the plaintiffs had a right of first refusal as to tracts 1 and 3.

On December 22, 1983, Koob granted Western an option to purchase a 47-acre parcel of land located approximately 195 feet south of the plaintiffs' property, at its nearest point. For this option, Western paid $2,000 to Koob. The option did not authorize Western to mine sand and was to expire on March 22, 1984, but it was extended on a number of occasions. The option pertained to the southeast quarter of the northwest quarter of section 10 and that part of the northeast quarter of the northeast quarter of section 10, lying south of the center of the Little Vermilion River. Koob made no offer to sell this land to plaintiffs.

On January 9, 1984, Koob sold the west five acres of the southwest quarter of the southwest quarter of section 3 to the Conkey Corporation. The Pasulkas did not become aware of the sale until after it occurred, and Koob did not offer to sell this property to plaintiffs either. Conkey purchased the land for a commercial Christmas tree operation. The plaintiffs did not complain to Koob about this sale because they were more concerned about the Western mining operation.

On January 23 or 24, 1984, plaintiffs met with O'Halloran and Sitterly, the president and vice-president of Western. These gentlemen indicated Western had been negotiating with Koob for some time prior to the plaintiffs purchasing their property. Plaintiffs were ad-

vised Western intended to mine sand from the land under option and that this was not a large deposit of sand and would be used up in a couple of years. Mrs. Pasulka informed these officers plaintiffs' agreement with Koob gave the plaintiffs certain rights which they believed precluded a strip mine from operating in the area.

On January 27, 1984, plaintiffs recorded a second unilateral memorandum, prepared by their attorney, which stated that the plaintiffs had a right of first refusal in all property owned by Koob in sections 10 and 11. Mr. Pasulka also wrote a letter regarding the Pasulka agreement and hand delivered the letter to Western, together with a copy of the second "Memorandum of Right of First Refusal." Mr. Pasulka also contacted Koob and stated his objection to the Western option. In addition, plaintiffs filed a petition for an injunction in the circuit court of La Salle County (No. 84—CH—20), but later voluntarily dismissed it.

On or about July 18, 1984, the defendants entered into an addendum to the option to purchase. Pursuant to the terms of said addendum, Koob gave Western the right to remove sand and gravel from the strip mine, and Western agreed to pay Koob 50 cents for every cubic yard of sand and gravel so removed. On July 25, 1984, Western resumed its mining operation which it had been conducting intermittently since February 29, 1984.

On August 8, 1984, Koob entered into an agreement with Unimin Corporation (Unimin) whereby Koob granted Unimin an option to purchase a 20-acre parcel north of North 35th Road. Plaintiffs did not become aware of the Unimin option until September 1984.

On September 7, 1984, Koob and Western entered into a second addendum to the option to purchase which granted to Western an easement in gross to tract 4, which land "may be used for any and all purposes of said Western Sand and Gravel Company." On September 12, 1984, the plaintiffs recorded a third "Memorandum of Right of First Refusal" which stated that their right of first refusal and the restrictions applied to all of Koob's land in sections 2, 3, 10, and 11.

Plaintiffs also presented evidence concerning the nature and effect of the mining operations. At times, there have been three bulldozers and strippers as well as four or five endloaders operating at the same time. In addition, there are heavy trucks hauling sand and gravel from the mine and averaging between 32 to 75 round trips per day. On occasion, the trucks make as many as 200 round trips per day. The mine generally operates between 6:30 a.m. and 5 p.m., six days a week, excluding winters. Plaintiffs complain the various engines and machines cause noise, dust, and odors.

The loudness of the noise was corroborated by plaintiffs' expert witness, who testified that Western's operation of the strip mine exceeded the noise limits set forth in section 901.102(a) of the Illinois Administrative Code (35 Ill. Adm. Code 901.102(a) (1985)). He also stated that the noise would be a very great source of annoyance and perhaps detrimental to those inside the living areas of plaintiffs' house. On the day on which their expert conducted his tests, there was extremely low activity at the mining operation. Another of plaintiffs' witnesses, Dr. Harold Wakely, testified as to the acceptable indoor limits of noise and stated these limits were exceeded.

Because of the noise, dust, and odors, the plaintiffs state they have been unable to enjoy the full use of the play court, patio, and other portions of their property. Moreover, they must keep the windows and doors of their home closed during the day because of the noise and odors. The plaintiffs do not have air-conditioning, and even with the windows closed, they still hear the noise inside the house. This noise hinders them from carrying on normal activities. In addition, it has increased the amount of stress among the family members.

Since October 15, 1980, the plaintiffs have been building their home. The costs have been $297,000, including land, improvements and plaintiffs' labor. The plaintiffs have expended several thousand hours performing construction work on their home. The house is located approximately 600 feet away from their closest residential neighbor. The main operation of the strip mine is 500 to 700 feet from the house.

According to plaintiffs, the Little Vermilion River has become polluted because of Western's dumping gravel into it and driving through it, and because of the erosion of the minespoils which Western dumps on the bank of the creek. Vegetation has been destroyed. The road which passes in front of the plaintiffs' house is damaged. However, plaintiffs have not shown evidence of violations of weight limits by Western's trucks. The trucks spill sand and gravel on the road and on other vehicles, resulting in broken windshields to plaintiffs' car on three occasions. There has been an increased amount of truck traffic. Over 178,572 tons of sand and gravel have been removed and there is a large hill of minespoils, mostly clay, which cannot sustain trees. A report of Western, filed with the La Salle County clerk's office on March 16, 1987, in compliance with the Surface-Mineral Land Conservation and Reclamation Act, contains the application to surface mine, a proposed reclamation plan and maps of the lands affected by surface mining. That report also contained a statement by Western of its

goal to develop the property into a four-acre lake with a natural wild-life habitat to be used for swimming, fishing, and company entertainment.

On September 24, 1984, plaintiffs wrote to Western demanding cessation of mining operations because it created a nuisance. On August 14, 1985, plaintiffs again wrote to Western asking them to account for the sand and gravel removed by Western "as they have been wrongfully converted and sold by you." On October 5, 1984, plaintiffs initiated this lawsuit by filing a complaint in the circuit court of La Salle County.

■■ In nearly every one of the 11 counts of plaintiffs' complaint, equitable relief as well as damages is sought. This means that for most of these issues, there are two standards of review. As to the matters in chancery, the court entered judgment for defendants at the close of plaintiffs' case in chief. It is as though defendants decided not to present any evidence. Had the matter gone to the jury, the chancellor need not have accepted the jury's verdict. (*Carroll v. Hurst* (1982), 103 Ill. App. 3d 984, 431 N.E.2d 1344; *Fleming v. Fleming* (1980), 85 Ill. App. 3d 532, 406 N.E.2d 879.) Unless the chancellor's findings of fact are against the manifest weight of the evidence, or there is some other palpable error, the findings will not be disturbed on appeal. *Brown v. Commercial National Bank* (1969), 42 Ill. 2d 365, 247 N.E.2d 894, *cert. denied* (1969), 396 U.S. 961, 24 L. Ed. 2d 425, 90 S. Ct. 436.

■ On the other hand, for matters of law, the trial court is only permitted to remove the case from the jury by directing a verdict when all the evidence, viewed most favorably to the nonmoving party, here the plaintiffs, is so overwhelmingly in favor of the moving party that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) This does not mean the existence of some evidence favoring plaintiffs will defeat the directed verdict. Evidence supporting the nonmovant may fade in significance when reviewed in light of all the proof, rendering only one verdict possible. (*Roedl v. Lane* (1976), 41 Ill. App. 3d 1062, 355 N.E.2d 354.) With these standards in mind, the evidence as to each count must be reviewed.

### COUNTS I THROUGH IV

Counts I and III are breach of contract actions against Koob. Count I involves the breach of the right of first refusal and count III involves the breach of restrictions. Counts II and IV are actions against Western for tortious interference with the same contractual

rights of plaintiffs as are set out in counts I and III, respectively.

As a matter of law, the trial court found the word "adjacent" was intended to apply to tracts 1 and 3 at the time Koob and plaintiffs entered into their contract. Having ruled that plaintiffs did not have rights to the property Western was mining under the option from Koob, the trial court also ruled that Western could not have tortiously interfered with plaintiffs' contractual rights and directed a verdict on counts II and IV.

The interpretation of an unambiguous written contract is a question of law for the trial court to determine. Likewise, the determination of whether an ambiguity exists is also a question of law. (*Nerone v. Boehler* (1976), 34 Ill. App. 3d 888, 340 N.E.2d 534.) Simply because the parties cannot agree on the meaning of a contract does not mean it is ambiguous. (*Joseph v. Lake Michigan Mortgage Co.* (1982), 106 Ill. App. 3d 988, 436 N.E.2d 663.) Even if the court determines there is an ambiguity and evidence of prior and contemporaneous transactions and other extrinsic facts are introduced to ascertain the contract's true meaning, the meaning of the contract may still be determined as a matter of law where the facts are uncontroverted or show the contract to have but one meaning. *Nerone v. Boehler* (1976), 34 Ill. App. 3d 888, 340 N.E.2d 534.

In this case, the facts are not controverted. It is merely a case of the parties disagreeing about the legal effect of the word "adjacent." As a result, it was appropriate for the trial court to take this matter from the jury.

In *Bowes v. City of Chicago* (1954), 3 Ill. 2d 175, 120 N.E.2d 15, *cert. denied* (1954), 348 U.S. 857, 99 L. Ed. 675, 75 S. Ct. 81, the definition of "adjacent" was discussed. Contiguous property is adjacent property, but not all adjacent property need be contiguous. Adjacent can mean near to or in the neighborhood or vicinity of another piece of property. What is adjacent property depends on the facts of each case.

Based on the facts that plaintiffs, when they purchased their property from Koob, (1) relied on a plat of seven tracts, representing only a very limited portion of Koob's property, (2) never went on the mine sight to inspect it, and (3) the only property to which restrictions were shown to apply by the evidence (other than a separate property sold by Koob to Cohn for a subdivision) were the tracts of land on that plat, the trial court correctly determined the parties intended the restrictions to be limited to the tracts on the seven-tract plat. To conclude that the restrictions apply to some additional 200-plus acres owned by Koob is unreasonable. This interpretation is also

supported by the price paid by plaintiffs for their property. That price, $25,500 for four-plus acres, is too low to believe Koob meant to relinquish control over the rest of his property.

Similarly, this reasoning can be applied to the plaintiffs' right of first refusal. In the instant action, the trial court limited plaintiffs' rights under the agreement only to tracts 1 and 3 on the seven-tract plat, those tracts contiguous to the one plaintiffs purchased.

This decision is supported by the memoranda of right of first refusal filed by plaintiffs. First, they claimed the right over only tracts 1 and 3. Only after the option was given to Western did they claim their right of first refusal applied to all property in sections 10 and 11 owned by Koob. Later they filed a third memorandum claiming a right of first refusal in all of Koob's land in Dimmick Township. Plaintiffs' actions indicate it was originally the intention of the parties to limit the restrictions and right of first refusal to tracts 1 and 3.

■ Certainly, the trial court's rulings in chancery are not against the manifest weight of the evidence. There is evidence to support those rulings. Furthermore, viewing all the evidence most favorably to plaintiffs, the evidence so overwhelmingly favors defendants no verdict contrary to the one directed by the trial court could ever stand. Once the court ruled the term "adjacent" under the agreement of the parties was restricted to tracts 1 and 3 and plaintiffs had no contractual rights pertaining to the land being mined by Western, then there was nothing left for the jury to decide as to counts I, II, III, or IV.

■ During the trial, plaintiffs sought to have a letter admitted because it referred to plaintiffs as "adjacent" land-owners, *i.e.*, adjacent to the Western mine. The court ruled that a letter from a vice-president of Western to another person not a party to the Koob-Pasulka transactions cannot be used to help define a term in a contract between Koob and Pasulkas. What the vice-president thought was "adjacent" had no bearing on what plaintiffs and Koob meant by "adjacent" in their agreement. In addition, this really is evidence of non-expert opinion on the ultimate fact to be determined by the court in this case. Therefore, the trial court correctly ruled the letter to be inadmissible.

### COUNT V

■ Count V is an action for fraud against Koob. The trial court, in directing a verdict, ruled that Koob's future intentions are not a proper subject for fraud and that the facts were not sufficient to constitute fraud as a matter of law. The law is clear. Neither misrepre-

sentations concerning events to happen in the future nor the failure to perform a promise to do something in the future constitutes the tort of fraud. (*Gold v. Vasileff* (1987), 160 Ill. App. 3d 125, 513 N.E.2d 446.) Here plaintiffs complain that Koob told them he would not open the gravel pit in the future. That may have been Koob's intention at the time, but he changed his mind. That's not fraud.

### COUNT VI

Count VI alleges promissory estoppel and reliance against Koob. Promissory estoppel and reliance are theories used to create a contract which otherwise would not exist. However, plaintiffs now argue fraud as the basis of count VI. The cases cited by plaintiffs are *Kurti v. Fox Valley Radiologists, Ltd.* (1984), 124 Ill. App. 3d 933, 464 N.E.2d 1219, and *St. Joseph Hospital v. Corbetta Construction Co.* (1974), 21 Ill. App. 3d 925, 316 N.E.2d 51.

*Kurti* held that a misrepresentation can be fraud if making a misrepresentation also breaches a fiduciary duty or a duty arising out of a confidential relationship. Koob had no fiduciary relationship with plaintiffs. Koob was selling them real estate and plaintiffs were represented by an attorney.

In *St. Joseph Hospital*, it was decided that a statement technically true when made and which the person making the statement later learns to be a false or misleading statement, creates a duty to disclose correct information to anyone known to be acting on the basis of the original statement. However, the statement in *St. Joseph Hospital* was a statement of fact, not a statement of opinion or future intention as in the present case. Therefore, the reasoning in *St. Joseph Hospital* has no application here.

In their brief, plaintiffs have also raised the suggestion that Koob's statements to them prior to plaintiffs' purchasing tract 2 were negligent misrepresentations. Negligent misrepresentation can only lie where the defendant is in the business of supplying information for the guidance of others who then rely on this information in business transactions with third parties. (*Grass v. Homann* (1984), 130 Ill. App. 3d 874, 474 N.E.2d 711.) The facts in this case do not support an argument for recovery under a negligent misrepresentation theory.

### COUNT VII

Plaintiffs actually argue promissory estoppel and reliance in reference to count VII, which sought recovery at law for breach of an oral contract. In response to count VII of plaintiffs' amended complaint, defendant filed an affirmative defense that such an oral contract vio-

lates the Statute of Frauds (Ill. Rev. Stat. 1987, ch. 59, par. 1 *et seq.*). The Statute of Frauds prevents the enforcement of a contract for sale of land or a contract creating an interest in land lasting longer than one year, unless the contract is in writing, signed by the person against whom enforcement is sought or another legally authorized, in writing, to sign for such person. Ill. Rev. Stat. 1987, ch. 59, par. 2.

Plaintiffs suggest that the sales agreement between Koob and plaintiffs is sufficient to satisfy the Statute of Frauds. However, if they are relying on that agreement, it is not an oral contract which they seek to enforce. So the plaintiffs must be trying to enforce some other agreement between themselves and Koob.

■ It is plaintiffs' contention that if the written restrictions do not apply to the land in question, then the same restrictions should apply because of some oral agreement. But the oral agreement was reduced to a written contract. That instrument is conclusively presumed to include all material terms. (*Johnson v. Flueckiger* (1980), 81 Ill. App. 3d 623, 401 N.E.2d 1317.) As a result, the enforcement of any oral contract is barred by the Statute of Frauds.

### COUNT VIII

Count VIII alleges Koob and Western breached a plan of development and seeks a permanent injunction against both defendants. Relief sought in this count is equity only.

■ It is appropriate for a court to find the existence of a general plan of development where a tract is subdivided into lots conveyed to separate purchasers subject to identical conditions designed to operate as inducements to the purchase of the lots and to create reciprocally enforceable rights in the nature of an "easement of incorporeal hereditament" in the other lots of the subdivision. (*Wayne v. Baker* (1955), 6 Ill. App. 2d 369, 128 N.E.2d 345.) A general plan may be found even where there are complete omissions of restrictions from some deeds. On the other hand, there are factors which tend to negate the existence of a general plan: (1) absence of any notice of restrictions in the recorded plat of the subdivision; (2) absence of the common grantor imposing similar restrictions on all lots; (3) failure of the deeds to show that such restrictions run with the land or bind the successors and assigns of the original grantee. *Wallace v. Hoffman* (1949), 336 Ill. App. 545, 84 N.E.2d 654.

■ In construing a deed, the parties' intentions are determined from the instrument as a whole, and if there is any doubt concerning the restrictive covenants, it is to be strictly construed in favor of full and unlimited legitimate use of the property and against restrictions.

*Henricks v. Bowles* (1958), 20 Ill. App. 2d 148, 155 N.E.2d 664.

After considering the testimony of witnesses and reviewing the documentary evidence herein, the trial court decided plaintiffs had not proved a general plan of development. Where a chancellor has seen and heard all the witnesses, the chancellor is in a better position to assess credibility, and a reviewing court will not overturn his findings unless they are against the manifest weight of the evidence. *Brown v. Commercial National Bank* (1969), 42 Ill. 2d 365, 247 N.E.2d 894.

In this case, there is no recorded subdivision and the plat which Koob showed plaintiffs did not purport to include the gravel pit area. The deeds and agreements between Koob and the various landowners convey property with no uniformity of size of lots and with no uniformity in restrictions. Plaintiffs could operate a home business. McCalebs could construct an apartment in addition to their residence. Lamps could construct a machine shed of unlimited dimensions and raise ponies. Conkeys had unlimited use and grew Christmas trees commercially. Therefore, it cannot be said the trial court's finding of no general plan of development was against the manifest weight of the evidence. Nor was any palpable error on the part of the court disclosed by plaintiffs, although plaintiffs do contest the propriety of their evidentiary rulings regarding the issue of a general plan of development.

In attempting to prove Koob had been developing his land pursuant to a general plan of development since 1974, plaintiffs tried to introduce: (1) the deeds to the purchases of lots at Timber Lane Estates, all of which Koob signed as grantor; (2) photographs of houses in Timber Lane Estates, and (3) evidence that Koob made a motion at a Dimmick Township meeting in 1966 to prohibit junkyards.

To be relevant, the item of evidence offered must tend to prove a fact in controversy or demonstrate that a matter in issue is more or less probable, testing it in light of logic, experience and accepted assumptions of human behavior. (*Mueller v. Yellow Cab Co.* (1982), 110 Ill. App. 3d 504, 442 N.E.2d 595; *Needy v. Sparks* (1977), 51 Ill. App. 3d 350, 366 N.E.2d 327.) However, even relevant evidence may be excluded if its admission would result in unfair prejudice, confusion of the issues, misleading the jury, undue delay, and the needless presentation of cumulative evidence. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §403.1, at 147 (4th ed. 1984).

The defendant argues that the deeds were cumulative since plaintiffs had already established Koob's involvement with Timber Lane Estates through the agreement with Cohn and the recorded plat and restrictions. Plaintiffs seem to be arguing that Koob's signature

shows his continued connection with the development. The logical conclusion, however, is that Koob signed the deeds pursuant to his agreement with Cohn to release all rights to lots sold in the subdivision as they were sold and as Cohn developed the area.

The trial court ruled that the deeds to the lots in Timber Lane Estates did not tend to prove Koob had a general plan of development for the rest of his land. Therefore, the court ruled the deeds were not material to the issues in the case. This is a logical ruling, since Koob was required to sign the deeds in light of the agreement with Cohn. In any event, Koob had testified he signed the deeds. So the deeds are cumulative.

█ So are the photographs of the houses in Timber Lane Estates as they relate to a general plan of development. Plaintiffs argue they should have been admitted to show the nature of the area on the nuisance issue. The court ruled that Timber Lane is a formal, dedicated subdivision with platted restrictions and therefore is entirely different from the rest of the property. He also stated that the testimony establishes the character of the neighborhood and the subdivision and that the pictures add nothing to it. Since plaintiffs had testified as to the types of houses in Timber Lane Estates and their proximity to the mine, the photographs are cumulative. Plaintiffs are not prejudiced by this ruling.

█ As for the motion on the ordinance at the Dimmick Township meeting to prohibit junkyards, that was made in 1966. The court ruled it was irrelevant. The remoteness in time to all the transactions in evidence supports the court's ruling and there is no logical connection between not wanting junkyards and having a general plan of development.

█ Another evidentiary ruling which plaintiffs asked this court to review was the refusal by the trial court to allow plaintiffs to present evidence of Koob's violations of "An Act to revise the law in relation to plats" (Plat Act) (Ill. Rev. Stat. 1983, ch. 109, par. 1 *et seq.*), governing subdividing of land into less than five acres. Plaintiffs argue Koob was going to great pains to avoid formally subdividing the farm and that the court should have allowed them to examine witnesses as to the fact Koob failed to file the appropriate affidavits and comply with the Plat Act. Specifically, Koob's testimony was that he agreed to sell the Alberts three-plus acres but deeded them five acres. The court ruled that Koob's state of mind in dealing with the Alberts has nothing to do with a general plan of development. Since Koob's agreement with and deed to the Alberts were in the record, the plaintiffs would need no other evidence to establish the point they sought

to make. In addition, for a witness to testify that the Plat Act was violated is a conclusion and properly excluded.

### COUNT IX

Count IX alleges the operation of the mine constitutes a nuisance. This count is addressed to Western only and originally sought only injunctive relief, although it was later amended to seek damages as well. In directing a verdict on this count, the trial court found it was undisputed that the mine was a legal business. According to the trial court, no evidence was presented to show Western operated its mine differently from any other mine or that it departed from standards in other gravel mines.

A private nuisance is a substantial invasion of another's interest in land, done negligently or intentionally and unreasonably, which causes a substantial annoyance to the landowner as opposed to merely offending any special sensitivities the landowner may have. In determining whether an activity constitutes a nuisance, the court balances the benefit resulting from defendant's use of the land, the suitability of the location to defendant's activity, and the harm to plaintiffs. Once the trial court has refused to grant injunctive relief, a reviewing court will overturn the order only if it is contrary to the manifest weight of the evidence. *Carroll v. Hurst* (1982), 103 Ill. App. 3d 984, 431 N.E.2d 1344.

In *Carroll*, relied on by both parties here, the plaintiff sought to have defendant's junkyard declared a nuisance. The court pointed out in its decision that there was no evidence any of defendant's junk landed on plaintiff's property. Nor was there testimony that defendant's use of his land created an unsightly view. The court then added that, "under Illinois law, a landowner does not have a right to a pleasing view of his neighbor's land." *Carroll*, 103 Ill. App. 3d at 990, 431 N.E.2d at 1349.

*Arbor Theatre Corp. v. Campbell Soup Co.* (1973), 11 Ill. App. 3d 89, 296 N.E.2d 11, involved a suit by the owner of an outdoor theatre seeking the declaration of a mushroom farm as a nuisance. The court said the occasional discomfort from odors must be endured where the occupation suited the rural locality and the use of the land was not unreasonable. Also the composting operation had been in existence since 1947. The theatre started in 1961 and the owner knew the farm was there.

In *Richardson v. Kitchin* (1979), 75 Ill. App. 3d 961, 394 N.E.2d 796, plaintiff sought to enjoin the construction of a slaughterhouse. The court recognized that we have an industrialized society and in or-

der to reap the benefits of such a society, we must also accept certain inconveniences.

Applying these principles to the case at bar, we consider the gravel pit was present when plaintiffs moved in. Although it was not then operating, plaintiffs did contemplate that possibility and even inquired of Koob about that possibility. There are also two other mining operations within three miles. Plaintiffs complain of the unsightly view, but plaintiffs do not have a right to a pleasing view. There is no evidence Western is operating in an unlawful manner or in a manner any different from the standards of other gravel mines. It is a legitimate business, operating in a suitable area, surrounded primarily by farmland. We recognize there will be some inconveniences from it, but in our society there are some inconveniences with which we must live in order to benefit from industry. Therefore, the denial of injunctive relief is not against the manifest weight of the evidence.

When a party seeks damages under a nuisance theory and the trial court, as here, has determined, as a matter of law, the activity is not a nuisance *per se,* then the question of whether the complained-of activity is a nuisance is generally a question of fact for the jury. However, that question may also be taken from the jury under rules governing directed verdicts. (*Patterson v. Peabody Coal Co.* (1954), 3 Ill. App. 2d 311, 122 N.E.2d 48.) Under the facts presented in this case, we agree with the trial court that when all the evidence is viewed most favorably to plaintiffs, the evidence is so overwhelmingly in favor of defendants that no contrary verdict could ever stand.

### COUNTS X AND XI

Count X is an action for conversion and count XI is an action for waste. Conversion is the intentional, unauthorized deprivation of property from another, permanently or for an indefinite time. The elements of conversion are: (1) defendant assumed ownership, dominion or control over plaintiff's personal property wrongfully and without authorization; (2) plaintiff has a right to the property; (3) plaintiff has a right to immediate possession of the property; and (4) a demand for possession of the property has been made by plaintiff. (*Scheduling Corp. of America v. Massello* (1983), 119 Ill. App. 3d 355, 456 N.E.2d 298.) Waste occurs when someone who lawfully has possession of real estate destroys it, misuses it, alters it or neglects it so that the interest of persons having a subsequent right to possession is prejudiced in some way or there is a diminution in the value of the land being wasted. (78 Am. Jur. 2d Waste §1 (1975).) Having ruled that plaintiffs have no rights in the property Koob optioned to West-

ern, the trial court appropriately directed verdicts as to counts X and XI.

Relative to these counts, there is a last evidentiary matter to consider, a statement of monies paid to Koob by Western which the trial court refused to admit into evidence. Plaintiffs claim this is relevant because they would be entitled to Western's profits, without deduction for expenses, as damages, under either the conversion or waste theories. Having determined plaintiffs have no cause of action for conversion or waste, we need not consider the propriety of the trial court's evidentiary ruling denying admissibility of this document.

Lastly, we consider plaintiffs' motion to strike portions of defendants' brief on appeal. Plaintiffs complain defendants' appendix to their brief and other minor, isolated statements are not supported by the record. This court has thoroughly reviewed the record, and while plaintiffs' motion to strike is denied, we can assure plaintiffs that this court has relied only on those portions of the record properly before the court.

For the foregoing reasons, the judgment of the circuit court of La Salle County is affirmed.

Affirmed.

GREEN, P.J., concurs.

JUSTICE LUND, dissenting:

I dissent as to the trial court's determination finding no general plan. I would reverse the rulings denying admission into evidence of the deeds representing the purchase of lots in Timber Lane Estates and photographs of the houses in Timber Lane Estates. I would also specifically provide that the determination of the existence of a general plan is not conditioned on the existence of a platted subdivision.

Our brethren in the Second District correctly stated the law as to enforcement of restrictions in *Osinski v. Collins* (1980), 85 Ill. App. 3d 198, 201, 406 N.E.2d 183, 186-87:

> "Those who seek to enforce a restriction have the burden of proving a clear intention to benefit their properties. (*Housing Authority v. Church of God* (1948), 401 Ill. 100, 108; *Punzak v. DeLano* (1957), 11 Ill. 2d 117, 119-20. See generally Annot., 51 A.L.R.3d 556, 578-79 (1973).) 'The right to enforce this restriction upon the use of the land is based, not upon the agreement made by the subsequent purchaser, but upon the theory that each purchaser buying a lot with notice of a general plan of im-

provement impliedly assents thereto and can be compelled to comply therewith at the suit of the owner of any other lot, without reference to the order in which the lots were sold.' (*Wiegman v. Kusel* (1915), 270 Ill. 520, 523. See also *Wayne v. Baker* (1955), 6 Ill. App. 2d 369, 374.) The intention of the restriction to benefit other properties must be found 'from the language of the deed itself, considered in connection with the circumstances *** not by secret intentions ***.' (*Hays v. St. Paul Methodist Episcopal Church* (1902), 196 Ill. 633, 636.) The significant factors bearing upon the existence of a general plan have been stated to include the presence of the restriction in identical language in every deed and express language in the deed showing that the restriction was intended to be binding upon successors and assigns. (*Henricks v. Bowles* (1958), 20 Ill. App. 2d 148, 151.) A general plan may exist, however, 'even though there are complete omissions of restrictions in some of the lots in the area affected by the plan.' *Wayne v. Baker* (1955), 6 Ill. App. 2d 369, 374; see also *Metcoff v. Dahlquist* (1929), 252 Ill. App. 222, 228."

The present case is an example of the lack of logic in limiting the finding of a general plan to a platted subdivision. Koob was specifically avoiding the subdivision requirements while at the same time seeking to establish a rural residential utopia. The various restrictions in different deeds establish this intention. To allow an owner of a picturesque rural setting to lead various owners into building rural residences with the expectation of a residential community and then to incorporate an inconsistent use is as much a wrong as allowing one lot in a platted residential subdivision to be used for a junkyard, factory, or other inconsistent use.

The east-west road which borders Pasulka's lot is a section line road which runs for 1,320 feet on the north side of Timber Lane Estates. The next 1,320 feet going west are bordered on the north by the Delaney tract, the McCaleb tract, and the Albert tract. It appears only agricultural land lies to the south of the second 1,320 feet. The next 1,320 feet are bordered on the north by part of the Albert tract, then the Lamps tract, then an undescribed tract, and finally by the Conkey tree farm tract. The south side of this 1,320 feet was bordered by what has been described as lots 1, 2, 3, and 4, running numerically from the west. Pasulka's homesite is on lot 2. Lots 1, 3, and 4 evidently still remain under Koob's ownership. Lot 4 is the access road for the company removing sand.

The evidence indicates that the plan was to create a rural residen-

tial environment. Residential restrictions were placed on various tracts along the entire three-quarters of a mile of the section road. Timber Lane Estates was sold by contract for purposes of large residential lots. Sheds for animal use were anticipated, but the restrictions appear based on a common design or scheme. To now say that the original developer can allow a use of adjoining nearby land in a manner inconsistent with the rural residential use, is, in my opinion, void of logic.

True, the cases relating to this question have involved subdivisions. (See *Housing Authority v. Church of God* (1948), 401 Ill. 100, 108, 81 N.E.2d 500, 504.) The theory, however, is protection of substantial rights for those who move into an area aware of and relying on certain restrictions. The absence of a platted subdivision should not defeat these rights which were obviously intended by the defendant developer.

This case should be remanded for consideration of the refused exhibits and a redetermination of the extent of the general plan.