ROBERT LOITZ, Plaintiff-Appellee, v. REMINGTON ARMS COMPANY, INC., Defendant-Appellant.

Fourth District   No. 4—88—0262

Opinion filed December 30, 1988.—Rehearing denied January 31, 1989.

1036

William E. Kelly and Charles E. Joern, Jr., both of Pope, Ballard, Shepard & Fowle, Ltd., of Chicago, and Nicholas J. Neiers, of Samuels, Miller, Schroeder, Jackson & Sly, of Decatur, for appellant.

Jon D. Robinson, of Hull, Campbell & Robinson, of Decatur, for appellee.

JUSTICE SPITZ delivered the opinion of the court:

This action was brought by plaintiff Robert Loitz against defendant Remington Arms Company, Inc., to recover for injuries plaintiff sustained from the explosion of his Remington Model 1100 shotgun. The incident occurred while plaintiff was trapshooting using shells he reloaded. Following a jury trial conducted in the circuit court of Douglas County, the jury returned a verdict in favor of the plaintiff and against defendant, awarding $75,000 compensatory damages and $1,600,000 punitive damages. Judgment was entered on the verdict. Defendant appeals from the judgment and the denial of the post-trial motion, asking this court to enter a judgment *n.o.v.* on the wilful and wanton count and grant a new trial on the negligence count. Alternatively, defendant requests a new trial on both counts or at least a substantial remittitur on the damages.

On June 19, 1983, plaintiff was competing in a trapshooting meet at the McCown Gun Club near Newman, Illinois. While shooting shotgun shells, which admittedly he reloaded himself, his Remington Model 1100 shotgun exploded. Plaintiff suffered injuries to his left hand and thumb.

Trapshooting typically involves firing several hundred rounds (shells) at targets during each meet. A weekend of trapshooting can involve as many as 600 rounds. As a result, handloading used shotgun shells is a common practice among trapshooters. It allows them to use reloaded shells at half the cost of new shells. Typically reloaders use a

machine that enables them to produce hundreds of shells in a single evening's work. However, reloading is literally the individual shooter's remanufacture of shells at home using the usual components (gunpowder, primer, *et cetera*) but without assurance of factory quality controls.

Plaintiff was using a reloaded shotgun shell at the time his Model 1100 shotgun exploded. In reloading his shells, plaintiff used a multistation reloading machine known as a Ponsness-Warren Model 800-B. A different function is performed at each of eight stations. First, the previously fired shell cases are loaded into the machine by hand one at a time throughout the reloading activity. The old primer is removed from each shell mechanically and replaced by a new one from a supply of new primers loaded into the machine before the reloading operation begins. The shell, with the new primer, is resized to its original dimensions and then is moved around on a turret that has places for eight shells. As the turret rotates, the shell with the new primer inserted moves to the next station to be loaded with powder. At the same time, a second shell casing is put in the machine, the old primer removed, and a new one inserted. As the turret moves again, the first shell moves to the next station where the wad is inserted by hand, the second shell moves to the powder station where it is loaded with powder, and a third used shell case is inserted by hand for primer replacement. After insertion, the wad is pushed down in place on top of the powder and then as the turret moves again the shells all advance to the next station. The first shell then receives shot. Thereafter it is crimped closed mechanically. It then moves to the ejection station as the turret turns again and it is ejected from the reloading machine. The various actions of the machine take place upon the operator's movement of an arm on the side of the machine.

Reloading requires the reloader's careful attention and concentration on the various steps involved. Distractions of any kind can lead to mistakes resulting in either duds or overloaded shells.

Glenn Jackson, the former owner and chairman of the Ponsness-Warren Company, explained the hazards associated with reloading. He testified about the mistakes that can be made and the consequences. He explained how it was possible to make dangerously overloaded shells that are virtually indistinguishable from properly loaded ones. For example, Jackson testified that a shell produced on a Ponsness-Warren 800-B with four times the normal powder charge but without a wad had a normal appearance. According to Jackson, the Ponsness-Warren 800-B reloader is "undoubtedly the best machine on the market." Jackson said that if this complex machine is operated correctly,

it is one of the safest reloaders. It is, however, subject to operator error.

The plaintiff admitted reloading the shells involved in the accident. Plaintiff had no problem with his reloading machine, and he did not recall any problem in reloading the shells he used when his shotgun exploded on June 19, 1983. When reloading shells he did nothing other than just look at the shells in order to make sure that they were properly loaded. He acknowledged that numerous kinds of mistakes were possible in reloading shotgun shells, and he had made reloading mistakes in the past. When he made a mistake during reloading he did not stop to mark or identify the mistaken shell while it was in the machine. Plaintiff also admitted that he had in the past forgotten to insert wads in shells he reloaded.

Although plaintiff stated it was possible to make a human error on the machine, in order to load multiples of any shell component and then load the shell into a gun, one would have to intentionally ignore the safety features of the reloading machine and ignore an improperly crimped shell. Plaintiff testified on cross-examination there are several situations in which the warning signs of spilled shot and improper crimps would not exist.

According to defendant's pressure data, it would take more than two charges of powder and some other combination of wad and lead shot components in order to burst a nondefective Model 1100 barrel. At trial, Jackson made one shell which he said could be made without altering the reloader. This shell had four charges of powder, no wad and one charge of lead shot. But, the shell proposed by defendant to explain the incident contained three powder charges, a plastic wad, and one charge of lead shot. However, Jackson, defendant's reloading expert, was unable to make this shell during his trial demonstration. Although defendant had previously made such a shell with the components and a reloader similar to those used by plaintiff, Jackson said he had no explanation as to how defendant loaded its shells. He admitted he was not a ballistics expert and that he did not know anything plaintiff was doing in reloading which would cause a gun to blow up. He did not know what pressures would be required to blow up a nondefective Model 1100 shotgun barrel. Jackson testified, however, that the failure to mark a shell where there has been an error is one of the most significant deviations from good reloading practices.

The Model 1100 shotgun is designed as a multi-purpose firearm suitable for trap and skeet shooting as well as hunting game. It has interchangeable barrels and is a semi-automatic, gas-operated shotgun. As such its low recoil makes it particularly attractive to high vol-

ume shooters. It was designed in response to user preferences with the aid of a sophisticated computer design program to be a state-of-the-art product. Following extensive laboratory and field testing the Model 1100 was introduced in 1963. It has been produced continuously since that time with over three million barrels sold to the public.

The Model 1100 is also purchased by the United States government for use by the various branches of the armed services. In that connection, the United States Government Procurement Office reviewed and approved defendant's raw material selection, product design, and manufacturing processes.

The barrel of the Model 1100 is manufactured from a low carbon steel known as American Iron and Steel Institute (AISI) 1140 modified steel. The AISI 1140 modified steel used to make the Model 1100 barrel is delivered to defendant as bar stock. Each shipment is inspected and tested by defendant using recognized sampling and testing methods to determine that it meets the raw material specifications. The bars are cut to useful size forming a slug which is then extruded, hot worked by hammer-forging and finished to form the barrel. The chamber area is heat treated. Other components are added to the barrel as the Model 1100 is manufactured. At various points in the process the assembly is inspected and tested. At the final assembly stage the shotgun is extensively tested and inspected. Thereafter each shotgun is sent to the gallery for firing and further testing, including what is known as proof testing.

Proof testing, a universally recognized testing method used throughout the firearm industry, subjects the article tested to stress within its design limitations, but substantially greater than it is expected to experience during normal use. The Model 1100 is designed to withstand upwards of approximately 45,000 pounds of internal pressure per square inch (psi) without failing catastrophically. Normal rounds produce 8,000 to 12,000 psi while the shells used for proof testing produce approximately 18,000 to 22,000 psi. Defendant's witnesses opined that plaintiff's shotgun barrel experienced at least 60,000 psi when it exploded.

Defendant does not conduct examinations after the proof testing to determine if there are defects or cracks in the barrel which might have been started by the proof test itself. Only a visual inspection is made of the gun barrel after proof test. Nothing is done after proof testing to inspect the inside of the barrel for cracks.

At trial, Dr. David Levinson presented the plaintiff's expert testimony. He stated that AISI 1140 modified steel contained tiny particles of manganese sulfide known as inclusions which were the cause

of microscopic cracks which may develop during the proof testing of the shotguns. These cracks grow each time normal shells are fired until the crack reaches such a size that the shotgun fails catastrophically when a normal shell is fired. According to Levinson, the selection of AISI 1140 modified steel for defendant's shotgun barrels was negligent because, in some shotgun barrels, the inclusions were either large enough or grouped together close enough so that cracks could begin to form and grow due to the repeated stressing of the barrel caused by subsequent firings. Levinson stated that chrome molybdenum steel should have been used instead. In addition, Levinson testified the shotgun barrel walls of the Model 1100 were not thick enough in the chamber area. He admitted, however, he was unable to measure the thickness of the plaintiff's shotgun because of its damaged condition. Levinson also testified that the Verson extrusion process defendant used to manufacture plaintiff's Model 1100 shotgun barrel aggravated its defective condition.

Levinson testified he measured a number of Model 1100 barrels and found the more recently manufactured barrels were thicker than the ones made about the time of the plaintiff's barrel. The barrel of defendant's 12-gauge Model 870 pump shotgun is made of the same AISI 1140 modified steel; however, its barrel is thicker than the Model 1100 barrel. Levinson considers the Model 870 barrel to be safer because it is thicker according to Levinson.

James Hutton, defendant's representative at trial, said he had no records regarding the history of Model 870 barrel failures, except he admitted that if Remington reported only four such failures, "that's all there is." Hutton further testified that he knew of no other shotgun manufacturers using the AISI 1140 modified steel which defendant uses in its Model 1100 barrels. However, other manufacturers do use AISI 1100 series steels that are very similar. Defendant's Model 1100 shotgun barrels have all been made of the same material. Defendant claims these barrels have always been made to the same specification for barrel wall thickness at the chamber area. However, defendant's 1980 catalog states that the then-current barrels were "of sufficient thickness and hardness that the repeated use of factory-loaded steel shot loads does not significantly affect their appearance or performance."

In approximately 1980, defendant began to change its manufacturing process for the Model 1100 shotgun barrel from Verson extrusion to auto-drilling. While defendant maintains this made no change in the strength of the barrel, defendant had no data on how many, if any, Model 1100 barrels had exploded where the barrels were made

after 1980. Hutton did admit that the manganese sulfide inclusions from the Verson extrusion barrels are "thicker and longer than those found in the post-1980 auto-drilling barrels." Hutton also admitted that since the Model 870 barrel is thicker, it, "in theory at least, is stronger." Plaintiff's barrel was a Verson extrusion barrel made before 1980.

Defendant produced evidence of warnings in the owner's manual about the dangers of improperly reloaded shells, and the plaintiff admitted that he had long been aware that reloads could be dangerous. Defendant's employee, James Hennings, presented physical evidence that showed how a deliberately overloaded shotgun shell would cause a Model 1100 shotgun to explode in a manner identical to the plaintiff's shotgun. Further, Hennings testified that the remains of the plaintiff's shotgun shell exhibited the kind of damage characteristically caused by an overloaded shell.

Dr. Richard Hertzberg, a metallurgist and fracture mechanics specialist from Lehigh University, presented extensive testimony regarding his own independent tests of Model 1100 shotgun barrel steel. Hertzberg explained the tests he designed and performed in his laboratory at Lehigh as well as his examination of samples of the plaintiff's shotgun barrel. His tests were based on scientifically recognized protocols of the American Society for Testing Materials and provided data from which he determined the "fatigue limit" or "endurance limit" of the steel used in the Model 1100 barrel. The fatigue or endurance limit of a material is the stress level below which the material will not fail by fatigue regardless of the number of cycles.

In the case of steel, the fatigue or endurance level is constant, which means at stress levels below the "endurance limit," the material will not fail by fatigue regardless of the number of cycles to which it is subjected. Hertzberg's tests indicate that (1) the plaintiff's shotgun failed from high pressure and not from fatigue; and (2) that the AISI 1140 modified steel as used in the Model 1100 was a proper selection that would not fail from fatigue at normal use pressures, because such pressures were below the "endurance limit." Moreover, cracks would not begin to grow to failure as a result of proof testing for the same reason.

Levinson agreed that the concept of the fatigue or endurance limit is well recognized in metallurgy, fracture mechanics, and failure analysis. However, Hertzberg's "C-ring tests" were criticized by Levinson because of the procedure used in these tests and because of the unrealistic toughness values obtained from the test. Hertzberg could not correlate the loads of stress above 100 pounds. He insisted

that, in his opinion, the barrels could not fail at proof-test pressures (18,000 to 22,000 psi) or less, because of his C-ring test results. However, when confronted with defendant's admission that at least one of its new barrels had failed during proof testing at the factory, Hertzberg said he was not aware of this and could not reconcile it with his studies.

The shell actually used by plaintiff was consumed in the explosion. All that was left was the brass base from the shell and, according to Hertzberg, it exhibited all the classic characteristics of high pressure overload.

Defendant has concluded in every prior similar Model 1100 explosion that the explosion was caused by high pressure shells. Defendant had admitted that 94 other explosions, which "were substantially similar to the explosion of the Robert Loitz shotgun," were reported to defendant before the explosion of plaintiff's gun. Of the 94 reports, 89 involved reloaded ammunition. Only five reports involved people who claimed they were using factory shells. Delores Moore and Terry Glover testified about the circumstances of their explosions, saying that they used new factory shells at the time their guns exploded. The witnesses whose Model 1100 shotguns exploded prior to June 19, 1983, testified about the circumstances surrounding their explosions. These witnesses, Nicholas King, Glover, and Moore, suffered similar personal injuries to those of plaintiff, and they had made reports and complaints to defendant before the plaintiff's explosion. Defendant has never "warned" the public that these guns have exploded, from whatever cause.

Hutton testified that these explosions would have been impossible with a new factory shell. While not admitting defendant made a defective Model 1100 shotgun barrel, Hutton did agree that it would be a "bad barrel" or a "bad product" if a barrel exploded on the firing of a normal shell.

Defendant has no records of the circumstances involving the 94 prior similar explosions and claims that all such explosions are due to high pressure shotgun shells. Hutton testified to another 100 Model 1100 barrel explosions in 1979 alone, wherein there were no claims for personal injuries. Hutton noted that these 100 other failures could have been due to barrel obstructions.

Defendant's product services representatives, James Stekl, admitted knowing that Levinson had advised defendant in 1979 or 1980 of claimed barrel defects caused by the manganese sulfide inclusions. Stekl also admitted that defendant's own metallurgist, Phillip Johnson, testified in 1980 that "chrome-moly steel would probably be bet-

ter to use for shotgun barrels because it did not have manganese sulfide inclusions."

According to Stekl, defendant disbanded its gun examination committee in 1983. This committee was responsible, among other things, for examination of failed shotguns returned to defendant with a complaint. These gun exams have been taken over primarily by Ed Sienkiewicz of the product services department. Defendant receives "a few" complaints each year of Model 1100 explosions, but Stekl did not know an exact number. Defendant's records on these complaints are destroyed three years after the final correspondence, including records from the gun examination committee. Defendant stipulated to a net worth of $162,314,000.

After the jury returned a verdict in favor of the plaintiff, awarding $75,000 in compensatory damages and $1,600,000 in punitive damages, defendant filed a post-trial motion seeking various forms of relief, including a new trial based on newly discovered evidence that less than two days after the verdict plaintiff was shooting trap competitively. He scored as high or higher than he did before the incident even though he testified at trial he had not been shooting trap competitively because of his injury. The plaintiff filed a motion to strike those portions of defendant's post-trial motion relating to newly discovered evidence. The plaintiff's motion was granted and defendant's was denied.

The first issues to be considered are whether the trial court erred by admitting evidence concerning the Remington Model 870 shotgun and whether the trial court erred by admitting testimony concerning chrome molybdenum steel where reference thereto in a catalog advertisement was a printing error and there is no evidence defendant ever used such material in its shotguns. Defendant complains that the trial court, in spite of defendant's motions *in limine* and objections, allowed plaintiff to introduce evidence concerning the barrel wall thickness of the defendant's Model 870 shotgun and to question Hutton concerning defendant's use of chrome molybdenum steel in an advertisement in a 1980 catalog. Defendant argues the Model 870 and Model 1100 are different in design, the Model 870 being pump action and the Model 1100 being semi-automatic. While both have barrels made from AISI 1140 modified steel, the Model 870 barrel is thicker in the chamber area than is the Model 1100 barrel because the 870 barrel was originally designed as a two-piece barrel, with the additional wall thickness being added to accommodate the threads on the barrel and barrel extension. Defendant admits, however, that the Model 870 barrel was later manufactured as a single piece, although

the thickness of the barrel wall in the chamber area remained the same to accommodate the shells, which had not changed dimension, and to be interchangeable with the older two-piece barrels already sold to consumers.

The only case cited by either party in the discussion of this issue is *Moore v. Remington Arms Co.* (1981), 100 Ill. App. 3d 1102, 427 N.E.2d 608. While the *Moore* opinion does discuss testimony concerning chrome molybdenum steel, there is absolutely no discussion about the Model 870 shotgun or any other alternative designs for 12-gauge shotguns.

■ In this case, plaintiff argues the testimony concerning the Model 870 is relevant to defendant's knowledge of an alternative, safer design for a 12-gauge shotgun. Hutton, defendant's employee, testified to the similarity and that defendant was aware of only four explosions of a Model 870 shotgun. Evidence of alternative designs is clearly relevant to the question of the feasibility of defendant adopting a safer design, since "feasibility" includes not only economy, effectiveness, and practicality, but also technological possibilities. (See *Schaffner v. Chicago & North Western Transportation Co.* (1987), 161 Ill. App. 3d 742, 515 N.E.2d 298.) Therefore, the trial court did not err in allowing evidence concerning defendant's Model 870 shotgun to be placed before the jury.

With regard to the reference to chrome molybdenum steel in an advertisement, plaintiff introduced as an exhibit the 1980 catalog for defendant which, in reference to the Model 1100, states: "Both barrel and receiver start as solid billets of ordinance-quality chrome molybdenum steel." Hutton testified that defendant did not use chrome molybdenum in its shotguns and that the advertisement must have been a mistake.

■ Levinson testified that chrome molybdenum steel was better material for use in shotguns than was AISI 1140 modified. Plaintiff's contention throughout trial was that defendant should use chrome molybdenum steel. Therefore, defendant's representation in a catalogue that it used chrome molybdenum steel might be relevant had there been testimony to the effect that plaintiff relied on the statement when purchasing the shotgun which exploded. Otherwise, the relevance of the ad to the issues in the case at bar is tenuous, at best, and the advertisement and testimony should not have been allowed into evidence. On the other hand, since Hutton explained the advertisement was a mistake, the trial court's evidentiary ruling was harmless error.

The next issue to consider is whether the trial court erred by

refusing to give defendant's jury instruction Nos. 1, 2, and 9 and by giving plaintiff's jury instruction No. 26. Defendant's tendered jury instruction No. 1 states:

> "Notice of prior accidents does not constitute knowledge of a defect in the product."

Defendant's No. 2 states:

> "Guns are inherently dangerous instrumentalities. The mere fact that other guns had exploded does not, therefore, in and of itself support the existence of a defect."

Both of these instructions were refused. The trial court did, however, give defendant's instruction No. 8:

> "The fact that other guns had exploded does not, in and of itself, support the existence of a defect or that the manufacturer was negligent."

All of these tendered instructions were based on the language in this court's earlier decision in *Moore*.

■ The purpose of jury instructions is to advise the jury of the correct principles of law to be applied to the evidence admitted at trial. (*La Salle National Bank v. City of Chicago* (1985), 132 Ill. App. 3d 607, 478 N.E.2d 417.) In determining the form in which an instruction will be given, the trial court has considerable discretion. (*Ralston v. Plogger* (1985), 132 Ill. App. 3d 90, 476 N.E.2d 1378.) Instructions must be supported by some evidence in the record, must correctly state the law and not mislead the jury, and must not overemphasize any particular matter. *Ralston*, 132 Ill. App. 3d 90, 476 N.E.2d 1378; *Malek v. Lederle Laboratories* (1984), 125 Ill. App. 3d 870, 466 N.E.2d 1038.

■ The instruction given correctly states the law without overemphasizing any particular matter. A court is not required to give more than one instruction on a particular subject, even though the party tendered more than one and even though the instruction given is the least favorable to the tendering party. The trial court did not err by giving defendant's No. 8 and refusing defendant's Nos. 1 and 2.

Defendant's No. 9 and plaintiff's No. 26 are jury verdict forms. Defendant complains that its tendered instruction was refused and plaintiff's was given. Defendant admits in its brief that the verdict forms given were: (1) compensatory damages for plaintiff; (2) compensatory and punitive damages for plaintiff; (3) compensatory damages for plaintiff reduced by any contributory negligence; (4) compensatory damages for plaintiff reduced by any contributory negligence and punitive damages for plaintiff; and (5) a verdict for defendant. In place

of these verdict forms, defendant would have the trial court give the jury only these verdict forms: (1) compensatory damages for plaintiff reduced by any contributory negligence plus punitive damages; (2) compensatory damages reduced by any contributory negligence; and (3) a verdict for defendant. Defendant contends the verdict forms given unduly emphasize a verdict for plaintiff and therefore the trial court erred in giving these verdict forms while rejecting those tendered by defendant.

■ In *Hunter v. Sukkar* (1982), 111 Ill. App. 3d 169, 443 N.E.2d 774, this court held that where contributory negligence of the plaintiff is an issue, Illinois Pattern Jury Instructions, Civil, No. A45.06, Comment (2d ed. 1981 Supp.) (IPI Civil) is to be given. There is no need to give IPI Civil No. A45.09, Comment (2d ed. 1981 Supp.), the general verdict form which makes no reference to contributory negligence. Since plaintiff's contributory negligence was an issue here, the trial court should not have given jury verdict forms based on IPI Civil No. A45.09.

While an error may have occurred, unless defendant can demonstrate that this error, alone or in combination with other errors, prejudiced the outcome of the trial, the court would be justified in considering such an error to be harmless. Of course, the test of whether the outcome was prejudiced will depend on the subsequent analysis of the verdict and the sufficiency of the evidence.

Next, this court is asked to decide whether the trial court erred by denying defendant's motion for a new trial based on newly discovered evidence that plaintiff's testimony was a fraud upon the court. Defendant submitted a motion for new trial based on newly discovered evidence which, defendant argues, demonstrates plaintiff testified falsely. The "newly discovered evidence" was in the form of an affidavit submitted by David B. Bopp, general manager of the Amateur Trapshooting Association (ATA). According to the affidavit, plaintiff competed in four ATA registered trapshooting competitions in June and August 1987, with the following results:

(a) 6/21/87    hit 96 of 100 at 16 yards
              hit 89 of 100 at 24 yards
(b) 6/27/87    hit 195 of 200 at 16 yards
(c) 8/9/87     hit 95 of 100 at 16 yards
              hit 91 of 100 at 24 yards
(d) 8/21/87    hit 89 of 100 at 25 yards
        (The World Series of Trapshooting)

Defendant complains that plaintiff testified at trial (conducted from June 8 through 18, 1987) that he could no longer pursue his favorite

sport of trapshooting and was prevented from doing so by his injury.

However, plaintiff's testimony is that he had not tried trapshooting "a registered target" since the incident which caused his injury. He did try some nonregistered trapshooting and, although he broke some targets, he had difficulty concentrating because he thought the gun would explode. He said he also tried hunting a couple of times, but had not hunted for about four years at the time of trial. On cross-examination, the following questions were asked and answers were given:

"Q. Now, you don't shoot trap as a hobby anymore, is that what you testified to?

A. That is correct.

Q. And the reason for that is your fear of shooting that you have now?

A. That is correct."

Plaintiff testified he had not consulted a medical doctor, psychologist, or psychiatrist concerning his fear.

■ *Powers v. Browning* (1954), 2 Ill. App. 2d 479, 486-87, 119 N.E.2d 795, 799, discussed the requirements which must be met by allegedly newly discovered evidence in order to support a motion for new trial:

" 'First, it must appear to be of such conclusive character that it will probably change the result if a new trial is granted; second, it must have been discovered since the trial; third, it must be such as could not have been discovered before the trial by the exercise of due diligence; fourth, it must be material to the issue; and fifth, it must not be merely cumulative to the evidence offered on the trial * * *.' [Citation.]"

These standards have been applied for many years. See also *Conlan v. Mead* (1898), 172 Ill. 13, 49 N.E. 720; *Stocker v. Scherer* (1953), 1 Ill. 2d 405, 115 N.E.2d 614.

In *Kaster v. Wildermuth* (1969), 108 Ill. App. 2d 288, 247 N.E.2d 431, the Illinois Supreme Court dealt with the denial of a motion for new trial, which motion was supported by newly discovered evidence relating to the value of the dog which was the subject of the suit and to contradictions which might tend to impeach witnesses. In *Kaster*, the court stated that evidence which tends to mitigate damages or to impeach a witness does not thereby meet the conclusive-in-character requirement unless it is practically conclusive that only nominal or slight damages should have been allowed where heavy damages have been recovered. Furthermore, while the courts do not condone the giving of false testimony, the giving of false testimony, in and of it-

self, is not a basis for granting a new trial unless the newly discovered evidence would probably change the result in a retrial of the case.

■ In the case at bar, the trial court did not commit an abuse of discretion in denying the motion for new trial based on newly discovered evidence. Nor did the trial court err by granting plaintiff's motion to strike this portion of defendant's motion for a new trial. First of all, there is no evidence plaintiff lied on the witness stand. Second, although he shot trap later and he was good at it, the fact is not of such a conclusive character as to "probably" change the result in a new trial. Third, the "fact" did not exist prior to trial and that is why it was not discoverable. It seems doubtful that the newly discovered evidence rule applies to events which occur after the trial. Otherwise, there would be no finality to litigation.

With regard to the compensatory damage award, the defendant asks this court to determine whether the verdict is against the manifest weight of the evidence and, therefore, whether the trial court committed an abuse of discretion by denying defendant's motion for a new trial. We will also consider whether the compensatory damages are so grossly excessive as to require a new trial, or in the alternative a remittitur.

■ In considering a motion for a new trial, the trial court must weigh the evidence and grant the new trial if the verdict is contrary to the manifest weight of the evidence. The granting or denying of the motion is a matter within the discretion of the trial court, and the decision of the trial court will not be disturbed on review unless a clear abuse of discretion is affirmatively demonstrated by the record. (*In re Village of Bridgeview* (1985), 139 Ill. App. 3d 744, 487 N.E.2d 1109.) In this case, defendant contends the trial court erred for two reasons: (1) defendant's scientific evidence overwhelmingly demonstrated that plaintiff's shotgun did not fail as a result of any act of omission of defendant; and (2) the opinions of plaintiff's expert, Dr. Levinson, were improperly based on speculation and conjecture.

■ In *Bautista v. Verson Allsteel Press Co.* (1987), 152 Ill. App. 3d 524, 530, 504 N.E.2d 772, 776, the standards for reviewing a jury verdict were summarized:

"A jury verdict should not be set aside merely because the jury could have drawn different inferences and conclusions from conflicting testimony. (*Turner v. Chicago Transit Authority* (1984), 122 Ill. App. 3d 419, 425, 461 N.E.2d 551.) Only if the verdict was palpably erroneous and wholly unwarranted

(*Frankenthal v. Grand Trunk Western R.R. Co.* (1983), 120 Ill. App. 3d 409, 415, 458 N.E.2d 530), was clearly the result of passion or prejudice (*Ogg v. City of Springfield* (1984), 121 Ill. App. 3d 25, 42, 458 N.E.2d 1331), or appears to be arbitrary, unreasonable, and not based upon the evidence will it be overturned (*Martin v. Zucker* (1985), 133 Ill. App. 3d 982, 990-91, 479 N.E.2d 1000)."

As a result, this court will not substitute our judgment for the judgment of the jury where the jury has considered conflicts in evidence, controverted facts, and the demeanor and credibility of witnesses. Instead, this court will consider the evidence in the light most favorable to plaintiff, and unless there is no evidence which fairly tends to support the jury's verdict, the verdict will not be disturbed. (*Elliott v. Sears, Roebuck & Co.* (1988), 173 Ill. App. 3d 383, 527 N.E.2d 574.) Of course, if this court determines the verdict is not contrary to the manifest weight of the evidence, then the trial court's denial of the motion for new trial cannot be said to have resulted from an abuse of discretion.

What defendant wants this court to do is to resolve the "clash of the experts." Before proceeding to the question of the relative weight of the testimony, it would seem more appropriate to discuss whether Levinson's opinions were improperly based on conjecture or speculation.

■■ An expert witness is a person whose special knowledge, skill, experience, training, or education is determined by the trial court to qualify said witness to testify to an opinion, based upon the witness's experience, because the opinion will aid the trier of fact in resolving a question which is beyond the understanding or competence of persons of common experience. Whether the person qualifies as an expert is a matter resting in the sound discretion of the trial court. *Craft v. Acord* (1974), 20 Ill. App. 3d 231, 313 N.E.2d 515.

Defendant does not challenge Levinson's characterization as an expert. Instead, defendant challenges the bases for several of Levinson's opinions.

■■ Certainly, a witness may not guess or state an opinion which is based merely on speculation or conjecture. (*Coffey v. Brodsky* (1987), 165 Ill. App. 3d 14, 518 N.E.2d 638.) However, the expert may give an opinion without disclosing the facts which underlie or support his opinion and it is the burden of the opposing party to bring out those facts on cross-examination. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140.) With these principles in

mind, the court must examine the specific testimony challenged by defendant.

Levinson theorized that some form of metal fatigue caused the AISI 1140 modified steel to fail in plaintiff's shotgun. His opinions may be summarized as follows: (1) the Model 1100 shotgun barrel wall was too thin in the chamber area and this contributed to the danger; (2) the barrel was not hard enough; (3) the 1980 change in the manufacturing process from the Verson extrusion process to the auto-drill process was an indication that the Verson process produced defective barrels; (4) chrome molybdenum steel is a better alternative than AISI 1140 modified steel is for shotgun barrels; and (5) AISI 1140 modified steel is used by defendant because it is a cheaper steel.

In arriving at his opinions, Levinson performed metallographic analysis, scanning electron microscope studies, hardness tests, barrel thickness measurements, and shotgun firing tests. He also examined a number of other Model 1100 shotguns, which were admitted as evidence in this case.

In the other exploded Model 1100's he examined, he found manganese sulfide inclusions and fatigue cracks at the fracture surfaces. His opinion that the fatigue cracks start at the manganese sulfide inclusions is also supported by the book written by defendant's own expert, Hertzberg, which describes the effect of manganese sulfide inclusions on the mechanical behavior of steel. Levinson presented the results of his hardness tests, barrel thickness measurements, scanning electron microscope research and photomicrograph studies, which he testified show cracks growing from the manganese sulfide inclusions in the Model 1100 barrels.

Levinson admitted he did no quantitative tests by which he could observe what fatigue or high stress overload looked like in AISI 1140 modified steel. He agreed that one approach to examining for the cause would be to compare a known sample of fatigue failure in AISI 1140 modified steel and a known sample overload or high stress failure in the same material. Levinson admitted he never ran any controlled fatigue tests on AISI 1140 modified steel as used in the Model 1100 shotgun barrel, nor had he run any tests on AISI 1140 modified steel to determine the point at which the barrel would come apart. He admitted that all inclusions would not be sites for crack initiation and he had no idea how large an inclusion would have to be in order for a crack to start to grow. The testimony relevant to each of Levinson's opinions follows.

As to barrel thickness, Levinson testified that the actual barrel

of plaintiff's shotgun could not be measured because it was not intact. Defendant suggests Levinson said his notes are "jumbled." However, this was not Levinson's testimony. Instead, he says that his recollection of the numbers are jumbled and he would have trouble remembering them, setting the foundation for having his recollection refreshed.

Levinson testified about differences in thickness of defendant's barrels, including thinner barrels made near the time of the manufacture of plaintiff's barrel, and thicker barrels made in approximately 1982. Using his measurements, he found that the barrels made in approximately 1982 were almost 5% thicker than those manufactured in the early 1970s. He measured six or seven different shotgun barrels in obtaining his information. Experts for both parties agree that a thicker barrel would result in a stronger barrel.

Levinson testified and compared the hardness of the Model 1100 unfavorably to that of a Winchester shotgun made out of chrome molybdenum steel. However, he also testified that a shotgun which is harder is more brittle and one which is softer is more ductile. A piece of metal which is more ductile is less likely to fracture than is one which is brittle. When asked whether heat treating would increase the hardness and make the barrels stronger, he believed that the steel is so infested with manganese sulfide inclusions that in his opinion it would not help very much.

Concerning the manufacturing process, according to Hutton, the "conventional drilling and turning operation" was used by defendant from 1965 until 1970. From 1970 until approximately 1980, defendant used the Verson extrusion method. In approximately 1980, defendant reverted to "a form of the old turn and drill process, but this time it was automated." Hutton said that "the auto-drill segment of the process is identical to what we did at the very onset, except now it's done fully-automated with a big custom machine instead of separate machines."

According to Levinson, the Verson extrusion barrels like plaintiff's contained larger, longer, and less well-distributed inclusions than the auto-drill blank from which the barrels were made after 1980. To Levinson, this meant that fatigue cracks were more likely to start in the Verson extrusion barrels. When asked which of the two processes resulted in a tougher, stronger barrel, Levinson replied, "[T]hat's hard to say," and his answer was interrupted by an objection to his saying anything further, which objection was sustained.

Levinson also suggested that defendant could use chrome molyb-

denum as an alternative steel. He said that this alloy had much lower levels of sulfur and therefore essentially no manganese sulfide inclusions in the metal. In this, he was agreeing with defendant's metallurgist, Phillip Johnson. He touted the Winchester Super X Model One shotgun as being made from chrome moly steel, but he did not have any information about its failure rate.

Levinson testified that defendant used AISI 1140 modified steel because it was a cheaper alternative. However, he also admitted he had no idea what defendant's manufacturing costs were. He did testify that the cost of a finished barrel using chrome molybdenum steel was approximately 30% greater than the cost of a barrel made from AISI 1140 or a similar steel.

While Levinson admitted he had no previous manufacturing experience, he testified that defendant knew or should have known AISI 1140 modified was not an appropriate metal for shotgun barrels and that alternative metals were available. According to Levinson, these Model 1100 shotguns are a serious threat to their users and defendant should have known of this threat to the public. Furthermore, defendant's Verson extrusion manufacturing process and the thinness of its barrel wall contribute to the problem of explosions, and defendant's proof test is inappropriate not only because the inclusions present in the barrels could start to crack at proof testing, but also because defendant does not, thereafter, inspect carefully to locate any such cracking.

Based on the extensive testimony in this case, there appears to be sufficient bases for most, if not all, of Levinson's expert opinions, any one of which could support the jury's verdict. As a result, this court need not compare, as defendant would have the court do, the relative weight of the expert testimony and analysis of tests presented by defendant's witnesses and plaintiff's witnesses. The weight to be assigned to each expert's opinion is for the jury to decide in the light of the experts' credentials and the bases for their opinion. (*Johnson v. Amerco, Inc.* (1980), 87 Ill. App. 3d 827, 409 N.E.2d 299.) While the conclusions reached by the experts are conflicting, the jury was free to accept the testimony of whichever one the jurors believed most.

As for defendant's contention that the testimony of defendant's experts overwhelmingly established the shotgun could not have exploded using normal rounds, the jury could find this testimony, primarily that of Hertzberg, rebutted for two reasons. First, when confronted with an admission by an employee of defendant that a Model 1100 barrel had split at proof-test pressures in 1985, Hertzberg could

not reconcile this fact with his opinion. Nor could Hertzberg explain how a Model 1100 barrel could explode at the firing of a new factory shell, and there was a stipulation to the effect that prior explosions had actually occurred to other Model 1100 owners, and some, but not all, admittedly involved reloaded shells.

Therefore, the jury verdict is not contrary to the manifest weight of the evidence. The trial court did not commit an abuse of discretion by denying the defendant's motion for a new trial. Nor is defendant entitled to a remittitur.

■■■ In *Chambers v. Rush-Presbyterian-St. Luke's Medical Center* (1987), 155 Ill. App. 3d 458, 467-68, 508 N.E.2d 426, 432, the court said:

> "Damages are peculiarly one of fact for a jury and courts are reluctant to interfere with the jury's exercise of its discretion in this area. (*Mileur v. Briggerman* (1982), 110 Ill. App. 3d 721, 726, 442 N.E.2d 1356.) Appellate courts have reversed a jury's determination of damages when they are excessive. However, the term 'excessive' has never clearly been defined; it has merely been described. It has been stated that a reviewing court will not disturb a jury's award of damages unless obviously the result of passion or prejudice. (*Shaheed v. Chicago Transit Authority* (1985), 137 Ill. App. 3d 352, 359, 484 N.E.2d 582.) And, an award is not excessive unless it falls outside the necessary limits of fair and reasonable compensation or it shocks the judicial conscience. (137 Ill. App. 3d 352, 359, 484 N.E.2d 582.) Additionally, a jury's award will not be subject to remittitur where it falls within the flexible range of conclusions which can be reasonably supported by the facts. (*Guerrero v. City of Chicago* (1983), 117 Ill. App. 3d 348, 352, 453 N.E.2d 767.)"

Here, plaintiff's left hand and thumb were injured, and he has made a good recovery because a doctor was present at the time the accident occurred and later operated on plaintiff to save the thumb, though his use of it is diminished. His actual damages, including medical bills and sick leave from work, amounted to $5,000. The jury awarded plaintiff $75,000.

■■■ In *Batteast v. Wyeth Laboratories, Inc.* (1988), 172 Ill. App. 3d 114, 141, 526 N.E.2d 428, 446, the court pointed out:

> "Plainly, reviewing court judges are not in as good a position as a jury to discern or evaluate evidence. Therefore, the observations and experiences in the affairs of life of reviewing court judges cannot take precedence over those of the jury when it

comes to determining how much money is reasonable compensation for injuries and suffering. Thus, a jury's award should not be disturbed on review as excessive unless it is shocking to the judicial conscience. Moreover, the judicial conscience must evolve with changing times so that it is still not shocked by the amount of a verdict that was also shocking to the community in the past, but is now consistent with current societal mores and demands. In the instant case, we cannot say that the amount of compensatory damages is shocking to a judicial conscience with a present-day awareness. We therefore do not believe that the amount of compensatory damages awarded by the jury should be disturbed."

In this case, too, the amount of compensatory damages should not be disturbed.

The remaining issues relate to punitive damages. These issues are: (1) whether the trial court erred in determining, as a matter of law, that the evidence showed this to be an appropriate case for the jury to consider awarding punitive damages; (2) whether the punitive damage award results from misconduct by plaintiff's counsel which inflamed the passion and prejudice of the jury; (3) whether the assessment of punitive damages in this case violated the eighth and fourteenth amendments of the Constitution of the United States by being an excessive fine; (4) whether the award of punitive damages is so grossly excessive as to require a new trial, or in the alternative, a remittitur; and (5) whether the trial court erred by admitting testimony of witnesses to prior similar occurrences.

In this case plaintiff was awarded $1,600,000 in punitive damages. Defendant suggests a judgment *n.o.v.* should have been granted in defendant's favor since the evidence does not support a punitive damage award.

■■■ Ordinarily, the standard of determining the propriety of granting a judgment *non obstante veredicto* is the same standard for determining the propriety of granting a directed verdict (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504). The trial court may remove questions of fact from the jury by directed verdict or judgment *n.o.v.* when all the evidence, viewed most favorably to the nonmoving party, so overwhelmingly favors the moving party that no contrary verdict based on that evidence could ever stand. (*Pedrick*, 37 Ill. 2d 494, 229 N.E.2d 504.) However, the *Pedrick* standard does not constitute the initial consideration in this case because whether a given case is an appropriate case for the jury to consider punitive damages is a question of law for the trial court.

*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.

■■■ Punitive damages are a means to punish a wrongdoer and to deter the wrongdoer and others from acting similarly in the future. Since punitive damages are penal in nature, they are not favored in the law and it is the court's responsibility to insure that punitive damages are not improperly or unwisely awarded. (*Kelsay*, 74 Ill. 2d 172, 384 N.E.2d 353; *Tague v. Molitor Motor Co.* (1985), 139 Ill. App. 3d 313, 487 N.E.2d 436; *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 450 N.E.2d 1199.) As the court in *Kelsay* pointed out, punitive damages may be awarded in. tort cases where the defendant's acts involve fraud, actual malice, deliberate violence or oppression, or when defendant's acts are done "willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." (*Kelsay*, 74 Ill. 2d at 186, 384 N.E.2d at 359.) In *Moore v. Remington Arms Co.* (1981), 100 Ill. App. 3d 1102, 427 N.E.2d 608, this court determined that punitive damages may be assessed against a manufacturer in a products liability case if the defendant's conduct reflects a flagrant indifference to public safety, but concluded that the experts' testimony did not establish defendant was aware of the existence of a defect and, therefore, the evidence failed to support a finding that defendant acted in flagrant indifference to the public safety.

In the case at bar, the experts' testimony is supplemented by the evidence of prior similar occurrences and complaints thereof to defendant to support plaintiff's claim that defendant wilfully failed to warn owners of the Model 1100 of the alleged defect and that such failure reflects defendant's flagrant indifference to the public safety. Since plaintiff presented evidence of damages resulting from the alleged defect, the fact that defendant had been notified of prior explosions before the plaintiff's shotgun exploded, and defendant's failure to issue a warning, then the trial court properly concluded this was an appropriate case for the jury to consider punitive damages. (See *Lipke v. Celotex Corp.* (1987), 153 Ill. App. 3d 498, 505 N.E.2d 1213 (involving the explosion of a Drano can and the failure to warn of that danger).) While *Moore* adopted the flagrant indifference standard recommended by David G. Owen in an article entitled *Punitive Damages in Products Liability Litigation,* 74 Mich. L. Rev. 1257 (1976), the opinion does not discuss the factors which Owen believes are important to determining the existence of such a flagrant indifference to public safety.

■■■ The factors which Owen discusses for determining a flagrant indifference are these:

"As is frequently true whenever a complex balancing of social interests is reduced to a one-sentence test, the proposed standard will be better administered if its elements are isolated. Thus, the following factors may properly be considered to determine whether a manufacturer's conduct reflects a flagrant indifference to the public safety:

(1) the existence and magnitude in the product of a danger to the public;

(2) the cost and feasibility of reducing the danger to an acceptable level;

(3) the manufacturer's awareness of the danger, of the magnitude of the danger, and of the availability of a feasible remedy;

(4) the nature and duration of, and the reasons for, the manufacturer's failure to act appropriately to discover or to reduce the danger; and

(5) the extent to which the manufacturer purposefully created the danger.

Each factor will be discussed briefly. First, a manufacturer's fault in failing to deal with a product hazard increases with the magnitude of the resulting potential for harm to the public. Second, as the costs of reducing such a hazard to an acceptable level diminish, so also does the credibility of excuses for failing to do so. Third, as the manufacturer's awareness of the existence, magnitude, and means to reduce a product hazard increases, so too does its duty to address the problem and its culpability for failing to do so. Fourth, the nature and duration of a manufacturer's failure to respond appropriately to a product hazard, its reasons for not responding more appropriately, and the nature and extent of any measures actually taken, all shed light on the extent to which the enterprise values profits over safety, and, accordingly, on its culpability. Finally, if the manufacturer created the danger deliberately, as by knowingly deceiving the public about the product's safety, it will usually be especially blameworthy and deserving of punishment." 74 Mich. L. Rev. at 1369-70.

Considering the evidence in this case, the trial court properly determined this was an appropriate case for punitive damages. Furthermore, there can be no question of the sufficiency of the evidence in support of a punitive damage award, in some amount, regardless of whether the *Pedrick* standard or a manifest weight standard is applied.

Of course, defendant may argue, and does, that the punitive damage award is excessive. Defendant puts forth the usual arguments: (1) the $1,600,000 award is not supported by the evidence, and (2) it results from the passion and prejudice of the jury, which was inflamed by the misconduct of plaintiff's trial counsel. Defendant asks this court to either grant a new trial or reduce the grossly excessive award of punitive damages.

■■ However, defendant adds a new twist to the analysis of this tort law question by arguing that the excessive award violates the eighth and fourteenth amendments to the Constitution of the United States. This is an excellent subject for law review commentators to cogitate, but it must be recognized that courts will refrain from deciding a constitutional question where the case can be decided by resorting to State law. (*People ex rel. Scott v. Briceland* (1976), 65 Ill. 2d 485, 359 N.E.2d 149; *People ex rel. Carey v. Route 53 Drive-In* (1976), 45 Ill. App. 3d 81, 358 N.E.2d 1298.) Furthermore, it is unnecessary to decide whether punitive damages are tantamount to a "fine" for purposes of the eighth amendment because there are already in place procedures for reducing excessive awards and the eighth amendment does not provide a new standard for evaluating when a punitive damage award is excessive. There is absolutely no need to resort to the United States Constitution to resolve the issue of whether a punitive damage award is excessive. Moreover, while defendant argues that punitive damages may be imposed "without adequate procedural safeguards," it is not the obligation of this court to raise this statement to the level of a constitutional argument.

Deserving of consideration is defendant's contention that, in this case, the action of the plaintiff's attorney inflamed the passion of the jury. This contention is based on two sets of facts. First, defendant complains there was a need to object 71 times during trial to prevent allegedly improper questioning and the introduction of improper evidence. This trial of a complex question was conducted from June 8 to June 18, 1987. Defendant admits that during the questioning of plaintiff's expert 35 objections were sustained, seven motions to strike granted and the jury given specific instructions twice. The second set of facts forming the basis of defendant's contention involves the statements of plaintiff's counsel to the jury. The first such statement is that defendant violated discovery rules and hid material from plaintiff. However, defendant admits that outside the presence of the jury defendant's objection to the remark was heard by the court and sustained. The jury was specifically instructed that the trial court found the items had been produced by defendant and that the jury

was to disregard any reference to the contrary. Defendant also suggests plaintiff's counsel was "baiting" the jury with these parting comments:

> "But I submit to you that somebody ought to do something; someone ought to tell these people that they should do something right and there is no reason why it can't come from this community and from you 12 people. There is no reason why Tuscola, Illinois can't tell Remington Arms Company it's time you stop this and that you do something for these people and that you warn them.
>
> And I submit to you in closing that there is no way that they're going to get the picture or the message, unless you make it loud enough and only you know how loud that ought to be."

However, defendant made no objection to the comment at trial.

■■■ Where defendant failed to object, defendant has waived the consideration of any alleged error (see *Zelinski v. Security Lumber Co.* (1985), 133 Ill. App. 3d 927, 479 N.E.2d 1091), since this is not a case involving repeated prejudicial comment during argument (compare *Manninger v. Chicago & Northwestern Transportation Co.* (1978), 64 Ill. App. 3d 719, 381 N.E.2d 383). Where defendant has objected, the objection was sustained and a motion to strike granted, or such other relief granted on the defendant's motion, then defendant really has nothing about which to complain. *Wright v. Yellow Cab Co.* (1983), 116 Ill. App. 3d 242, 451 N.E.2d 1313.

■■■ A party is not entitled to an absolutely error-free trial, as long as the trial, as a whole, was fair. (*Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 356 N.E.2d 779.) A trial judge is accorded wide latitude in conducting a trial. (*Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 398 N.E.2d 188.) Considering the length of the trial, the complexity of the issues, and the fact that defendant was allowed much of the relief it sought during the trial, it is hard to believe defendant could have had a fairer trial. Therefore, the jury award cannot be said to be the result of plaintiff's attorney's improper conduct inflaming the passions of the jury.

However, the unnecessary introduction of the medical treatment of those involved in prior similar occurrences could, possibly, have inflamed the passions of the jury. In the instant case, Nicholas King was allowed to testify that in 1982 he lost his entire left thumb in an explosion involving shells he reloaded on a Ponsness-Warren 800-B. He was also allowed to identify his Remington Model 1100 shotgun and have it introduced into evidence over objection. King described

the accident and his injuries. In addition, he exhibited the scars and wounds to the jury from the witness stand and testified about the loss of his thumb and part of his fingers, his 14 operations and how his hand was sutured to his abdomen.

Based on the description and exhibition of injuries by King, defendant moved for a mistrial. The motion for a mistrial was denied. It was agreed that defendant's objection and motion for a mistrial would apply to the other prior occurrence witnesses without repetition.

Terry Glover was allowed to testify to the alleged explosion of his Model 1100 shotgun in 1982. He claimed to be using new factory shells although he admitted that his complaint initially included allegations against the shell manufacturer. He too was allowed to identify his gun and detail his injuries and his subsequent medical treatment and residual disability.

Finally, Delores Moore was allowed to testify about the explosion of her Model 1100 shotgun while using an alleged factory shell and the injuries she sustained. She was permitted to identify her shotgun and it was also admitted into evidence over objection. She testified in detail how her thumb was amputated in the 1978 explosion, how she was required to undergo eight operations, how nerves and tendons were removed from various parts of her body for surgical repair of her hand, and how she had her hand sewn to her stomach for a period of six weeks. The trial court specifically instructed the jury that consideration of the testimony was to be limited to the issue of punitive damages and should not be considered for any other purpose.

Delores Moore was the plaintiff involved in *Moore*. As already discussed, in *Moore* this court adopted the requirement that in order for punitive damages to be awarded against a manufacturer in a products liability case, plaintiff must show the injury resulted from conduct on the part of the manufacturer reflecting *"flagrant indifference"* to *public safety*. This standard has apparently been adopted by the Illinois Supreme Court as well. *J.I. Case Co. v. McCartin-McAuliffe Plumbing & Heating, Inc.* (1987), 118 Ill. 2d 447, 516 N.E.2d 260.

However, in *Moore* this court had occasion to consider the admission of evidence of prior occurrences, and stated:

"The purpose of the admission of prior occurrences to establish punitive damages in products liability cases is to show that the manufacturer had or should have had knowledge of harm inflicted on consumers by its product and with flagrant indifference to public safety failed to warn consumers of or remedy

the defect. *** Guns are inherently dangerous instrumentalities. The mere fact that other guns had exploded does not, therefore, in and of itself support the existence of a defect. The information presented at trial from the interrogatories did not constitute an admission sufficient to establish knowledge of a defect in the gun metal. Plaintiff was certainly not bound by Remington's decisions regarding the causes of the prior explosions and could have tried to prove that one or more of the prior gun failures was caused by a defect in the gun metal or manufacturing. The failure to show that any of the causes listed by Remington were at odds with what actually occurred, or with what the person involved in the explosion believed occurred, further demonstrates plaintiff's inability to establish that Remington should have been put on notice of a defect in its guns by these prior explosions." *Moore*, 100 Ill. App. 3d at 1112, 427 N.E.2d at 615.

In this case, defendant argues that admission of such evidence was not only prejudicial, but irrelevant, or in the alternative, cumulative to other evidence. Defendant contends that notice of prior claims could not have been an issue since defendant had stipulated to the existence of prior claims. Plaintiff counters by pointing out that the evidence was relevant to (1) defendant's knowledge and therefore flagrant disregard, and (2) the "over-all magnitude" of the public danger.

Recently, the relevance of evidence was discussed in *Pasulka v. Koob* (1988), 170 Ill. App. 3d 191, 206, 524 N.E.2d 1227, 1237:

"To be relevant, the item of evidence offered must tend to prove a fact in controversy or demonstrate that a matter in issue is more or less probable, testing it in light of logic, experience and accepted assumptions of human behavior. (*Mueller v. Yellow Cab Co.* (1982), 110 Ill. App. 3d 504, 442 N.E.2d 595; *Needy v. Sparks* (1977), 51 Ill. App. 3d 350, 366 N.E.2d 327.) However, even relevant evidence may be excluded if its admission would result in unfair prejudice, confusion of the issues, misleading the jury, undue delay, and the needless presentation of cumulative evidence. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §403.1, at 147 (4th ed. 1984)."

Section 403.1 of the Handbook of Illinois Evidence adds:

"In evaluating the incremental probative value of proffered evidence, the fact that the opponent has offered to stipulate or is not disputing the proposition for which the evidence is being

offered must be considered. However, the fact that the proposition is not being disputed is not determinative; the proponent of the evidence is entitled to have the court also consider the fair and legitimate weight that introduction of the evidence would have upon the trier of fact." M. Graham, Cleary & Graham's Handbook of Illinois Evidence §403.1, at 148 (4th ed. 1984).

The King, Glover, and Moore incidents occurred after plaintiff's shotgun was manufactured (1972), but before it exploded (1983). Therefore, the incidents could have no bearing whatsoever on the "flagrant indifference" of defendant in manufacturing the gun. However, it is arguably relevant to any "flagrant indifference" to the public safety by failing to warn about a defect, the existence of which defendant was aware. So the existence of the similar incidents and of the injuries are relevant to whether defendant was aware of alleged defects and flagrantly disregarded the public safety in failing to warn. However, while the nature of the injury may be relevant to help plaintiff establish the injuries occurred as a result of a common defect, the relevance of the medical treatment of the injured witnesses is doubtful. Although such evidence can be inflammatory, defendant must demonstrate that its admission affected the size of the award.

Therefore, the larger question is whether the punitive damage award is excessive. The amount of punitive damages awarded is a matter within the province of the trier of fact, and unless the award is clearly excessive, the award will not be disturbed. (*Lurz v. Panek* (1988), 172 Ill. App. 3d 915, 527 N.E.2d 663.) Even though the punitive damage award greatly exceeds the compensatory damages awarded, there has been no requirement that punitive damages be proportional to compensatory damages. (*Tague v. Molitor Motor Co.* (1985), 139 Ill. App. 3d 313, 487 N.E.2d 436.) In determining whether an award of punitive damages is excessive, the courts are to consider three factors: (1) the nature and enormity of the wrong; (2) defendant's financial status; and (3) defendant's potential liability. *Lipke v. Celotex Corp.* (1987), 153 Ill. App. 3d 498, 505 N.E.2d 1213; *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 450 N.E.2d 1199.

The only evidence of defendant's financial status is defendant's net worth of over $160 million. While this court fully appreciates the reluctance a corporate defendant might have in offering evidence of its financial condition, in order to reverse on this factor alone, the reviewing court would need something more than the record here

discloses. There is no evidence defendant will go out of business or be forced into bankruptcy by this punitive damage award, which is less than 1% of the defendant's net worth.

In considering the nature and enormity of the wrong, the court is evaluating whether and to what extent defendant's behavior was egregious. In the case at bar, defendant's failure to warn of a known defect in flagrant disregard of the public safety is the activity which resulted in the punitive damage award. A recent article, Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products*, 49 U. Chi. L. Rev. 1 (1982), examined the potential for abuse because of the author's realization that large punitive damage awards have become common, thereby raising concern for the future stability of American industry. See also Forde, *Punitive Damages in Mass Tort Cases: Recovery on Behalf of a Class*, 15 Loy. U. Chi. L.J. 397 (1984).

The evidence in the case at bar includes detailed testimony about prior, similar occurrences which were made known to defendant before plaintiff's gun exploded. Not only that, but prior to plaintiff's gun exploding, defendant was aware that the jury in *Moore* found · defendant's actions to require compensation to be paid to an injured party and that this court would uphold such a finding. Still, defendant did nothing. As a result, the case at bar appears to be a much more appropriate case for the awarding of punitive damages than was *Moore*.

That brings the analysis to a consideration of the final factor, the defendant's potential liability. At the time of the trial, only a very few of the three million barrels produced by defendant have exploded due to some possible defect in design or manufacture. What the future holds is anybody's guess. But several commentators have grown concerned that, because of the potential for repeated large punitive damage awards in products liability cases, the existence of several businesses and even the stability of the economy of the United States might be jeopardized. The fears seem to be that punitive damage awards are unpredictable and that a number of large awards will drive a manufacturer out of business. But there is no evidence that will occur here.

■ Certainly, $1.6 million is a lot of money. And it would seem inappropriate to have this plaintiff get a windfall, where plaintiffs like Moore get no direct benefit, particularly in light of the fact that the object of punitive damages is to penalize and deter defendant, not to compensate plaintiff. However, given defendant's action, the judicial conscience of this court is not overly shocked by this award.

It is possible a jury in the future could present an even greater award if defendant persists in failing to warn, or perhaps to recall. Nor should this court necessarily be concerned with the general argument that manufacturers might go out of business. It may be that the activity of a particular manufacturer is so reprehensible that the manufacturer ought to be put out of business. Accordingly, it is the determination of this court that there exists neither a basis for reversing the punitive damage award in this case nor for granting defendant a remittitur.

For the foregoing reasons, the judgment of the circuit court of Douglas County is affirmed.

Affirmed.

LUND and KNECHT, JJ., concur.