SPRAGUE FARMS, INC. and Paxton Farms, Inc., Plaintiffs,

v.

PROVIDIAN CORPORATION, formerly known as Capital Holding Corporation; Providian Retirement Plan Trust, formerly known as Capital Holding Retirement Plan Trust; Vigortone Ag Products, Inc., and Webel Feeds, Inc., Defendants.

No. 96–3017.

United States District Court, C.D. Illinois, Springfield Division.

June 19, 1996.

Johnine J. Brown, Maureen Martin, Brown Martin PC, Chicago, IL, Lois A. Bell, Bell & Mann, Winchester, IL, for Sprague Farms Inc., Paxton Farms Inc.

Peter D. Sullivan, Hinshaw & Culbertson, Chicago, IL, Byron G. Cudmore, Hinshaw & Culbertson, Springfield, IL, for Providian Corp.

Donald J. Moran, Chicago, IL, for Vigortone AG Products Inc., Webel Feeds Inc.

Byron G. Cudmore, Hinshaw & Culbertson, Springfield, IL, for Providian Retirement Plan Trust.

## OPINION

RICHARD MILLS, District Judge:

Hypothetical pleading.

How far does it go?

Not so far that a party may hypothetically plead the *injury* necessary to sustain claims in tort.

## I. BACKGROUND

A. *The Parties*

Sprague Farms, Inc. and Paxton Farms, Inc. are Nevada corporations doing business

in Illinois. Paxton Farms is a wholly-owned subsidiary of Sprague Farms, so they will be referred to simply as Sprague Farms. Webel Feeds, Inc. (Webel Feeds) operates a feed-mill near Pittsfield, Illinois. Webel Feeds is a subsidiary of Vigortone Ag Products, Inc (Vigortone). Providian Corporation (Providian) is an insurance and financial services company based in Louisville, Kentucky. Providian Retirement Plan Trust (Retirement Plan) is a retirement plan trust organized pursuant to the Employee Retirement Income Security Act of 1974 (ERISA). The parties refer to Providian and the Retirement Plan collectively as Capital. They do so because many of the documents relevant to this case refer to these parties by their former names, Capital Holding Corporation and Capital Holding Retirement Plan Trust.

Sprague Farms and its predecessors have owned and farmed various parcels of land in Pike County, Illinois for over 100 years. Only three parcels are involved in this lawsuit: Parcel 1 consists of 171.1 acres and includes a swine containment system; Parcel 2 consists of 155 acres; and Parcel 3 consists of 187.29 acres and is located across a road and immediately north of property owned by Webel Feeds and Vigortone.

### B. *The Events Leading to this Lawsuit*

In 1979, Sprague Farms borrowed money and secured its debt with a mortgage on Parcels 1–3. In 1989, after ten difficult years, Sprague Farms restructured its debt. By the beginning of 1993, Sprague Farms was behind on its payments for the new loan. Making payments became even harder after Sprague Farms lost 300 acres of growing crops in the 1993 Mississippi River flood. The unhappy lender forced Sprague Farms to put Parcels 1–3 on the market.

By the end of December 1993, Sprague Farms had found a willing buyer: Capital. On December 30, 1993, Sprague Farms entered into a sale agreement with Capital.[1] The agreement allowed Capital thirty days to hire an environmental consultant to evaluate and inspect the property. The contract specifically provided that if Capital "determines

that the condition of the Property ... is unsatisfactory or that clean up [sic] or remediation of hazardous material is necessary and Seller refuses to undertake such remediation, Buyer will have the option to terminate the Sale Agreement by written notice to Seller...."

The closing date was initially set for February 15, 1994 but extended until April 15, 1994. On the morning of April 15, 1994, Capital informed Sprague Farms that it did not intend to go through with the deal. Capital stated that, based on information received from an environmental consultant, "it is very likely" that contamination from the Webel Feeds/Vigortone property extended to Parcel 3 of the Sprague Farms property.

Capital based its fears of pollution on Parcel 3 on information provided by an environmental consulting firm. On April 14, 1995, the day before Capital backed out of the land deal, the environmental consultant sent Capital an ominous letter. The letter stated that, on July 2, 1992, Webel Feeds had reported a gasoline release to the Illinois Environmental Protection Agency (IEPA) and had subsequently removed five underground storage tanks from its site.

Sprague Farms researched the gasoline release and removal of the underground storage tanks. Sprague Farms discovered that Webel Feeds told IEPA that contamination from the spill had migrated off-site, but in an easterly direction, not a northerly direction. Because Parcel 3 is to the north of the Webel Feeds/Vigortone property, this information suggests that Parcel 3 was not contaminated.

After Capital backed out of the sale agreement, Sprague Farms sold Parcels 1–3 at auction to avoid foreclosure. Sprague Farms withheld the ten-acre portion of Parcel 3 adjacent to the Webel Feeds/Vigortone property where contamination might be present.

Sprague Farms sued Capital, Vigortone, and Webel Feeds in Pike County, Illinois Circuit Court. Defendants removed the case to this Court and Sprague Farms subsequently amended its Complaint. Counts I and II are against Capital for breach of

---

1. Sprague Farms pleads that it does not know whether the agreement was with Capital (now Providian) or the Capital Retirement Trust (now the Providian Retirement Trust).

contract and fraudulent misrepresentation. Count III is against Webel Feeds and Vigortone alleging trespass. Count IV is against Webel Feeds and Vigortone alleging nuisance. This cause is currently before the Court on Webel Feeds' and Vigortone's motion to dismiss Counts III and IV for failure to state a claim upon which relief may be granted.

## II. LEGAL STANDARD

In ruling on a motion to dismiss, the Court must accept "as true the factual allegations of the complaint" and must draw "all reasonable inferences in favor of the plaintiff." *Hammond v. Clayton*, 83 F.3d 191, 192 (7th Cir.1996). At a minimum, a complaint must contain allegations regarding each material element necessary to recovery under a viable legal theory. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). Courts will not grant a motion to dismiss under Fed.R.Civ.P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957).

## III. ANALYSIS

Defendants Webel Feeds and Vigortone offer four reasons why the Court should dismiss Counts III and IV: (1) that the economic loss doctrine bars the recovery Sprague Farms seeks, (2) that Sprague Farms cannot recover because its claims are based on the "purely hypothetical possibility that Plaintiffs' Parcel 3 has been contaminated ...," (3) that Sprague Farms has not properly pleaded a claim of trespass in Count III, and (4) that Count IV does not properly allege a claim of nuisance.

### A. *Economic Loss Doctrine*

The economic loss doctrine was first established in Illinois by *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). In *Moorman*, a purchaser of a grain storage tank sued the seller alleging various tort and products liability causes of action. 91 Ill.2d

at 74, 61 Ill.Dec. at 748, 435 N.E.2d at 445. The Illinois Supreme Court held that the purchaser of the storage tank could not recover in tort for its purely economic loss but would have to resort to available contractual remedies.

■ Subsequent decisions have used sweeping language to describe the economic loss doctrine, but the rule has remained the same. In *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 115 Ill.2d 146, 104 Ill.Dec. 689, 503 N.E.2d 246 (1987) the Supreme Court of Illinois summarized the rule by stating: "A plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover in an action in contract." 115 Ill.2d at 153, 104 Ill.Dec. at 692, 503 N.E.2d at 249. "[T]he basic principle of *Moorman* is that the type of loss, not the defendant's conduct, is critical. When only economic loss is incurred, the plaintiff may only raise contract theories if the defendant's alleged conduct constituted a tort as well as a breach of contract." *Bethlehem Steel Corp. v. Chicago Eastern Corp.*, 863 F.2d 508, 523 (7th Cir. 1988); *see also Decatur Memorial Hospital v. Connecticut General Life Insurance Co.*, 990 F.2d 925, 928 (7th Cir.1993) ("*Moorman* prevents the use of tort measures of damages in what are really contract cases."). These cases confirm that the economic loss doctrine only applies to cases in which a party to a contract brings tort claims against another party to the same contract.

■ Even if some subsequent decisions suggest that the economic loss doctrine applies to all tort actions, not just tort actions between parties to a contract, the definition of "purely economic loss" presupposes the existence of a contract and confirms the doctrine's proper role. Economic loss includes damages for inadequate value, repair or replacement of the defective product, lost profits, and decrease in the value of the product. *Moorman*, 91 Ill.2d at 82, 61 Ill.Dec. at 752, 435 N.E.2d at 449. Therefore, "purely economic loss," as the term is defined, cannot exist without a contract between the plaintiff

and the person who allegedly caused the economic loss.

■ The economic loss doctrine does not apply to Counts III and IV because Webel Feeds and Vigortone did not have.a contract with Sprague Farms.

## B. *Purely Hypothetical Claims*

■ Webel Feeds and Vigortone object to Counts III and IV because these counts are stated hypothetically. Count III[2] asserts that if Parcel 3 was contaminated as a result of the gasoline release on the Webel Feeds/Vigortone Property, that contamination constituted a trespass.[3] Count IV[4] alleges that if Parcel 3 was contaminated as a result of the gasoline release on the Webel Feeds/Vigortone Property that contamination constituted a nuisance.[5] Webel Feeds and Vigortone argue that a complaint cannot rest solely on an "if."

The central claim of Counts III and IV is that if Parcel 3 was contaminated that contamination constituted a tort. Both trespass and nuisance require entry or invasion of land. Sprague Farms argues that it has hypothetically pleaded these torts, as it is permitted to do under Fed.R.Civ.P. 8(e)(2), by stating that Webel Feeds and Vigortone are liable if Parcel 3 was contaminated as a result of the gasoline release on the Webel Feeds/Vigortone property.[6] Webel Feeds

2. The material portions of Count III state:

> 53. In June 1992, Webel Feeds notified IEPA that petroleum and diesel fuel had leaked from five underground storage tanks on the Webel Feeds/Vigortone property. This property is located immediately south of Sprague Farms Parcel 3. In July 1992, Webel Feeds/Vigortone removed five underground storage tanks from the property.
>
> 54. In a January 1994 report to the IEPA, the environmental consulting firm retained by Webel Feeds/Vigortone informed IEPA that contaminated groundwater had migrated off-site. The consulting firm went on to state that it had conducted additional testing and concluded that the contamination had migrated in an easterly direction toward a creek running north/south. The report stated that the testing done was sufficient to establish the extent of any off-site contamination. According to the report, the contamination was not expected to reach the creek for several years. No testing was conducted to the north on Sprague Farms Parcel 3.
>
> 55. As alleged above, Capital Holding Corporation or in the alternative the Retirement Plan informed Sprague Farms that it had been told that contamination "very likely" exists on Parcel 3 of the Sprague Farms property as a result of leakage from the Webel Feeds/Vigortone underground storage tanks.
>
> 56. As alleged above, this statement is false. If such contamination does [sic] exists, however, it constitutes an unlawful entry of Parcel 3 which was caused by the unlawful conduct of Webel Feeds/Vigortone in failing to detect and prevent leakage from the tanks.
>
> 57. As a result of such unlawful conduct by Webel Feeds/Vigortone, the Buyer refused to proceed with the purchase of the Sprague Farms property, and Sprague Farms suffered damage to its property, as well as the other damages alleged above.

Amended Complaint ¶¶ 53–57.

3. A claim of trespass "may be based on negligent or intentional intrusion onto land." *Porter v. Urbana–Champaign Sanitary District*, 237 Ill. App.3d 296, 303, 178 Ill.Dec. 137, 142, 604 N.E.2d 393, 398 (4th Dist.1992); *see also Dial v. City of O'Fallon*, 81 Ill.2d 548, 44 Ill.Dec. 248, 411 N.E.2d 217 (1980) (discussing liability for various types of invasion of another's land).

4. The central allegation of Count IV is:

> 59. If contamination exists on Parcel 3 of the Sprague Farms property, the presence of such contamination has damaged the property, has obstructed Sprague Farms' use of it and resulted in termination of the Sale Agreement by Capital Holding or in the alternative the Retirement Plan.

Amended Complaint ¶ 59.

5. In Illinois, private nuisance is defined as "that which unlawfully annoys or does damage to another." *Belmar Drive–In Theatre Co. v. Illinois State Toll Highway Commission*, 34 Ill.2d 544, 546, 216 N.E.2d 788, 790 (1966). "To constitute a nuisance, the act, structure or device complained about must cause some injury, real and not fanciful, and must work some material annoyance, inconvenience or other injury to the person or property of another." 34 Ill.2d at 547, 216 N.E.2d at 790–91. Furthermore, a claim of nuisance must allege some invasion of the plaintiff's interest in land. "[I]n order to recover for a private nuisance, plaintiffs must show (1) there was a *substantial* invasion of the use and enjoyment of their land; *and* (2) the invasion was either *negligent* or *intentional* and unreasonable." *Malone v. Ware Oil Co.*, 179 Ill.App.3d 730, 731, 128 Ill.Dec. 558, 558, 534 N.E.2d 1003, 1003 (4th Dist.1989), *app. denied*, 126 Ill.2d 560, 133 Ill.Dec. 669, 541 N.E.2d 1107 (1989).

6. Rule 8(e)(2) provides:

> A party may set forth two or more statements of a claim or defense alternatively or

and Vigortone acknowledge that a party may plead hypothetically, but note that all pleadings are subject to the requirements of Fed.R.Civ.P. 11. Rule 11 requires, *inter alia*, that "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery...." Fed.R.Civ.P. 11(b)(3). Webel Feeds and Vigortone argue that Counts III and IV are improper because Sprague Farms never alleges that Parcel 3 was contaminated. They believe that Counts III and IV are not supported by evidence and do not fall within the exception created by Rule 11(b)(3) because all the facts cited in the Amended Complaint indicate that Parcel 3 was not contaminated.

By challenging Counts III and IV on this basis, Webel Feeds and Vigortone raise a novel question regarding the interaction of Rule 8 and Rule 11. Do Rule 8(e) and Rule 11(b)(3) always allow a party to hypothetically plead the essential elements of a claim or do those rules serve a more limited purpose? This inquiry leads to another, more fundamental question: can a party ever hypothetically plead the entry or invasion of land that forms the basis of a claim of trespass or nuisance?

Common sense suggests that the answers to the questions should be "of course not." The average citizen would not believe that someone can file a lawsuit in federal court without first determining whether he or she has been harmed by someone else. Sometimes, however, litigants must make factual or legal allegations before fully investigating them, and the Federal Rules of Civil Procedure allow this in Rules 8(e)(2) and 11(b)(3).

Read literally, Rules 8(e)(2) and 11(b)(3) seem to allow a litigant to plead the existence of any unknown fact, provided he or she identifies the fact as one that the party believes will be supported by facts uncovered after further investigation. At least . one

court has rejected such a sweeping interpretation of these rules. In *Geisinger Medical Center v. Gough*, 160 F.R.D. 467 (M.D.Pa. 1994), the defendants in a collection action—a former hospital patient and his wife—raised a counterclaim of medical malpractice. *Id.* at 468. The counterclaim stated that "after a reasonable opportunity for further investigation and discovery, the evidence will show that, during plaintiff's treatment of defendant Andrew Gough, plaintiff performed surgery during which Andrew Gough's Achilles' [sic] tendon was severed, unnecessarily, inexplicably and carelessly." *Id.* The defendants argued that their counterclaim was proper under Rule 11(b)(3). The court rejected "the defendants' interpretation of the 1993 amendment to Rule 11 as giving them a general license to plead a claim first and then allowing them to conduct the necessary investigation in support of it. The amendment's intended effect is more limited in scope." *Id.* at 469 (citing Fed.R.Civ.P. 11, Advisory Committee Note 1993).

The Advisory Committee Notes to Rule 11 state:

> The certification with respect to allegations and other factual contentions is revised in recognition that sometimes a litigant may have a good reason to believe a fact is true or false but may need discovery, formal or informal, from opposing parties or third persons to gather and confirm the evidentiary basis for the allegation. Tolerance of factual contentions in initial pleadings by plaintiffs or defendants when specifically identified as made on information and belief does not relieve litigants from the obligation to conduct an appropriate investigation into the facts that is reasonable under the circumstances; it is not a license to join parties, make claims, or present defenses without any factual basis or justification.

This statement demonstrates that Rule 11(b)(3) is not a license to allege facts first

---

hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the

alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds. All statements shall be made subject to the obligations set forth in Rule 11.

and then investigate. Instead, Rule 11(b)(3) is designed as a safety valve for parties who must plead certain facts, but cannot confirm them before pleading because an adversary controls the information necessary to substantiate these claims.

The *Geisinger Medical Center* case demonstrates the proper use of Rule 11(b)(3). In that case, the defendants raised a compulsory counterclaim and identified it as one that they believed would be supported by evidence after an opportunity for discovery. *Id.* The court agreed that the claim was a compulsory counterclaim and the defendants were "required ... to plead it in their answer, even though they may not have had sufficient evidentiary support for it at the time." *Id.* at 469; *see also Charles Rubenstein, Inc. v. Columbia Pictures Corp.*, 14 F.R.D. 401, 402–03 (D.Minn.1953) (permitting a defendant in a conspiracy case to plead in the alternative that no conspiracy existed and that if one did, the plaintiff was a member). The court believed that the defendants could not be expected to thoroughly investigate their medical malpractice claim in the time allowed to plead their counterclaims. Therefore, the court concluded that Rule 11(b)(3) allowed the defendants some leeway in presenting and preserving their claim.

■ As *Geisinger Medical Center* demonstrates, Rule 11(b)(3) allows some parties the freedom necessary to preserve claims they could not otherwise plead if they had to conduct a full investigation before pleading. But the rule does not disturb litigants' general obligation to review the facts and information within their reach before making allegations.

In this case, Sprague Farms still owns the potentially polluted portion of Parcel 3. Therefore, Sprague Farms could have tested for contamination before filing this lawsuit. Apparently Sprague Farms did not do so. Instead it recites numerous facts which suggest that Parcel 3 is not polluted. In particular, Sprague Farms recites the contents of a January 1994 report done by the environmental consultant hired by Webel Feeds/Vigortone which concluded that the only off-site pollution had migrated in an easterly direction—away from Parcel 3.

After reciting numerous pieces of evidence which suggest that Parcel 3 was not affected by the gasoline release, Sprague Farms simply says that if Parcel 3 was contaminated, Webel Feeds and Vigortone are liable. Under these circumstances, Sprague Farms' hypothetical allegation is not enough. Sprague Farms offers no reason why it could not first determine whether Parcel 3 was polluted. Third parties and opponents did not control this information—Sprague Farms did. Sprague Farms does not claim that it was under time pressure to file its claims against Webel Feeds/Vigortone. Therefore, Rule 11(b)(3) does not apply. Sprague Farms has not sufficiently alleged the existence of pollution to support a claim of trespass or nuisance against Webel Feeds and Vigortone.[7]

■ Although the Court primarily relies on the proper interpretation of Rules 8(e)(2) and 11(b)(3), another reason requires the Court to dismiss Counts III and IV: Sprague Farms' hypothetical claims of trespass and nuisance do not allege the existence of an actual controversy.

■ Counts III and IV merely assert that a controversy may exist if Sprague Farms subsequently discovers pollution on Parcel 3. Article III, Section 2 of the United States Constitution limits the exercise of the judicial power to "cases or controversies." A "controversy" in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touch-

---

7. Sprague Farms does not argue that its nuisance claim is valid even if Parcel 3 is not polluted. Instead, Sprague argues that it has alleged a proper claim of nuisance by stating that if Parcel 3 was contaminated, it was as a result of the Defendants' unlawful conduct. Sprague Farms argues that it has stated a claim of nuisance based solely on the allegation that the invasion of its property was the result of the Defendant's unlawful conduct. Therefore, the Court will not attempt to determine whether the Illinois Supreme Court would recognize a claim of nuisance without an allegation that pollution entered the plaintiff's property.

ing the legal relations of parties having adverse legal interest. It must be a real and substantial controversy admitting of specific relief, through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (citations omitted).

The facts, as alleged in Counts III and IV do not present an actual controversy. Instead, they present a hypothetical question to the Court. Tort claims accrue when the plaintiff suffers an injury. *See Hermitage Corp. v. Contractors Adjustment Co.,* 166 Ill.2d 72, 77, 209 Ill.Dec. 684, 687, 651 N.E.2d 1132, 1135 (1995). A tort claim brought before it has accrued—or before the plaintiff knows that it has accrued—is inherently hypothetical. As this Court is forbidden to give advisory opinions on hypothetical claims, *see, e.g., GNB Battery Technologies, Inc. v. Gould, Inc.,* 65 F.3d 615, 620 (7th Cir.1995), it would be improper for this Court to decide the issues presented in Counts III and IV.

### IV. CONCLUSION

Because Counts III and IV are purely hypothetical, they must be dismissed. The Court need not, therefore, address the third and fourth points Webel Feeds and Vigortone raise in their motion to dismiss.

Sprague Farms may, in the future, conduct an investigation and discover that its property was contaminated as a result of the gasoline release on the Webel Feeds/Vigortone property. If that happens, Sprague Farms might be entitled to replead its causes of action against Webel Feeds and Vigortone. Therefore, Counts III and IV will be dismissed without prejudice.

*Ergo,* Defendants' Vigortone Ag Products, Inc. and Webel Feeds, Inc. Motion to Dismiss Counts III and IV of the First Amended Complaint Under Fed.R.Civ.P. 12(b)(6) is ALLOWED. Counts III and IV are DISMISSED WITHOUT PREJUDICE.